EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* REYNALDO RODRÍGUEZ HERNÁNDEZ, acusado y apelante.

*Números:* CR-62-241,
CR-62-242,
CR-62-243

*Resueltos:* 5 de noviembre de 1964

184

*Pablo Cancio*, abogado designado por el Tribunal Supremo para ofrecer asistencia legal al acusado en apelación; *J. B. Fer-*

*nández Badillo, Procurador General,* y *J. F. Rodríguez Rivera, Procurador General Auxiliar,* abogados de El Pueblo.

Sala integrada por el Juez Asociado Señor Pérez Pimentel como Presidente de Sala y los Jueces Asociados Señores Rigau y Dávila.

EL JUEZ ASOCIADO SEÑOR PÉREZ PIMENTEL emitió la opinión del Tribunal.

En horas de la madrugada del día 25 de mayo de 1961 el establecimiento comercial de doña Hermina Colón Muñiz, sito en el barrio Don Alonso de Utuado, fue objeto de un escalamiento. Frente a dicho establecimiento apareció el cuerpo del obrero Narciso Vélez Santiago, quien había muerto a consecuencia de heridas producidas por balas de revólver.

En una acusación conteniendo tres cargos, el Fiscal acusó al apelante como autor del mencionado escalamiento, del asesinato de Narciso Vélez y de un delito de portar armas prohibidas. Después de celebrarse un juicio ante tribunal de derecho por haber renunciado el acusado a juicio por jurado, se le declaró convicto de los tres delitos y se le condenó a reclusión perpetua en el caso de asesinato en primer grado, a sufrir de 7 a 15 años de presidio en el caso de escalamiento en primer grado, y de 2 a 5 años de presidio en el caso por portar armas prohibidas concurrentemente estas dos últimas penas con la de reclusión perpetua.

No conforme, el acusado apeló. Por tratarse de penas tan severas como la de reclusión perpetua, designamos al abogado Pablo Cancio para que le representara ante este Tribunal y le ofreciera la asistencia legal necesaria a fin de que pudiera ejercitar plenamente su derecho de apelación. Dicho letrado ha cumplido a cabalidad su encomienda y en un buen elaborado alegato señala la comisión de dos errores por el tribunal sentenciador, el primer de los cuales lo enuncia así:

"El Tribunal Superior de Puerto Rico, Sala de Arecibo, cometió error de derecho al declarar culpable y convicto al acusado de los delitos de asesinato en primer grado y escalamiento en

primer grado, a base de la declaración de un cómplice como lo era el testigo Pedro Cintrón Adorno sin que hubiera en el caso prueba otra alguna que tendiera a conectar al acusado con la comisión de dichos delitos, o sea, sin que la declaración de dicho cómplice quedara debidamente corroborada."

Para resolver las cuestiones planteadas en este señalamiento de error debemos determinar, 1) si el testigo Pedro Cintrón Adorno era un cómplice en la comisión del delito de escalamiento en primer grado; 2) si dicho testigo era igualmente un cómplice en la comisión del delito de asesinato en primer grado; y 3) en caso de decidirse que dicho testigo era tal cómplice, si su testimonio fue corroborado con prueba independiente que tienda a conectar al acusado-apelante con la comisión de ambos delitos.

Para ello forzoso es hacer un resumen de la prueba.

El supuesto cómplice, Pedro Cintrón Adorno, declaró en el interrogatorio directo, según el resumen correcto que de dicho testimonio hace el propio apelante en su alegato, lo siguiente:

"En el examen directo declaró que para el 24 de mayo de 1961, vivía en Bayamón y se dedicaba a dar servicio de pasajeros para lo cual poseía un automóvil Chevrolet Bel-Air del 1957, 'hard-top'. Que como conductor de este automóvil prestó servicio la noche del 24 de mayo al acusado Reynaldo Rodríguez Hernández. Que esa noche el testigo venía de la Marina de llevar un marino a la Parada 11 y cuando bajaba la luz de la 18, el acusado lo mandó a parar y él paró. Que el acusado le pidió que lo llevara a Jayuya que le iba a dar $20.00 y el testigo le dijo que no podía porque el automóvil no tenía un asiento y si era mucha gente no podía caminar con ellos, a lo cual contestó el acusado que era él sólo y el testigo entonces accedió a llevarlo a Jayuya. Que eran como las siete de la noche y que no conocía al acusado ni había hablado anteriormente con él. Que el acusado entonces abordó el automóvil y llegaron a un garage en Buchanan, en la intersección 'y allí echamos gasolina y un cuarto de aceite, que no lo necesitaba, pero lo llevaba de repuesta en el automóvil que lo hago en todo automóvil que tengo'. Que la gasolina fue despachada por una persona que 'de nombre le dicen Wilfredo,

conocido por Pedro'. Que el acusado pagó $4.15 por la gasolina y aceite, que en ese momento el acusado ocupaba el asiento del frente 'porque el de atrás no lo tenía'. Que el acusado llevaba sombrero 'de esos que le dicen gatos' y vestía ropa de civil. Que después de echarle gasolina al automóvil, el acusado le dijo 'voy a ver una muchacha que está por allá en una casa como ama de llaves en Las Lomas' y entonces el testigo se dirigió hacia Las Lomas, y luego cuando el acusado le dijo que ya era tarde continuó la carretera y se dirigieron hacia Jayuya. Que en el camino hacia Jayuya el testigo se sintió con sueño y entonces entraron en una cafetería de Manatí. Que en la cafetería los atendieron una muchacha y un muchacho y había un señor trigueño en la caja. Que serían las nueve y media a diez de la noche. Que además de café les sirvieron mallorca y bizcocho. Que el testigo pagó lo que consumieron. Que después de salir de la cafetería cogieron la carretera hacia Ciales e hicieron unas cuantas paradas porque el testigo se sentía mal. Que en el Barrio Don Alonso de Utuado había un establecimiento a mano derecha, una tienda. Que entonces el acusado le dijo: 'Párate aquí que aquí yo voy a dar el golpe.' Que el testigo entonces le dijo al acusado que no se atrevía, que eso no era lo mejor, que se iba a perjudicar y entonces el acusado le dijo que él le iba pagando con dinero y que tenía que hacer lo que él le decía. Que entonces el testigo se paró como a medio hectómetro del sitio del establecimiento. Que el acusado se bajó del auto. Que el acusado, cuando lo contrató en la zona metropolitana, llevaba una bolsa de papel. Que en ese momento no sabía lo que el acusado llevaba en la bolsa. Que al bajarse del carro, el acusado se apeó con el bulto. Que tampoco sabía en ese momento lo que el acusado llevaba en el bulto. Que al apearse el acusado, el testigo se acostó en el asiento del carro porque se sentía enfermo. Que el acusado se dirigió hacia la tienda. Que eso 'sería bastante de madrugada, pero no podía decir hora fija, porque no usaba reloj'. Al preguntarle el fiscal si sería de cuatro a cuatro y media de la mañana, responde—'Algo así.' Que entonces el testigo vio bajar el reflector de una luz, como un mechón. Que ese mechón bajaba como por detrás del automóvil y llegó hasta el punto del negocio. Que entonces al llegar al bulto con la luz sintió un disparo y cuando se levantó sorprendido vio dos fogonazos más de un arma. Que esos disparos los hizo el acusado, dirigiéndolos hacia el bulto que caminaba. Que entonces el acusado venía corriendo;

que el testigo estaba poniendo el carro en neutro porque sino no prendía y el acusado le preguntó: 'Me vas a dejar?' y se montó en el carro. Que al llegar, el acusado traía consigo el mismo bulto y el revólver. Que al montarse al carro el acusado cargó el revólver con balas de una cajita. Que luego, como a medio kilómetro de la tienda, se le explotó una goma al carro y con el nerviosismo siguió corriendo con la goma explotada por lo que el carro iba dando bandazos. Que entonces se detuvo y cambió la goma, poniéndole la de repuesto y colocando en el baúl la que se había explotado. Que al montarse el acusado en el carro frente al negocio en el barrio Don Alonso, el testigo le preguntó: '¿Tú has matado a alguien?' y el acusado le contestó: 'Fue unos tiritos que yo tiré, dale para alante, que del resto me encargo yo.' Que al salir de la carretera de Ciales en la intersección con la militar, donde hay un aviso de 'Pare', los detuvo la policía. Que la policía le pidió la licencia y empezaron a registrar el carro. Que del auto extrajeron un cartucho de papel donde encontraron unos guantes, un 'flashlight' y un revolver con balas. Que ese era el mismo cartucho que llevaba el acusado cuando abordó el automóvil y cuando se dirigió a la tienda. Que ese cartucho lo encontró la policía debajo del asiento donde estaba sentado el acusado. Que la policía también encontró debajo de dicho asiento un destornillador y una barra. Que también ocupó la policía la caja de balas. Que entonces la policía metió al acusado y al testigo en el carro de patrullas y los llevó a la fiscalía de Arecibo. A solicitud del Fiscal, el Tribunal admitió en evidencia una fotografía del automóvil del testigo, como Exhibit #2 del Pueblo y la caja de balas, el revólver, la barra, los guantes y el destornillador como Exhibits Números 3, 4, 5, 6 y 7 de el Pueblo, respectivamente. Al terminar el examen directo de este testigo el fiscal, a solicitud de la defensa, le entrega a éste copia de una declaración jurada prestada por el testigo al fiscal con anterioridad al acto del juicio." (Alegato apelante, págs. 3 a 6.)

En el contrainterrogatorio declaró que con anterioridad al día del juicio había prestado una declaración jurada ante el Fiscal Efraín Ruiz; que cuando el acusado abordó su automóvil traía un saco de papel, un bulto como de 25 libras pero que no sabía lo que contenía; que el acusado no le dijo

a lo que iba a Jayuya. Confrontado con la declaración jurada prestada ante el fiscal, la defensa le preguntó que por qué había dicho en esa declaración "Dimos la vuelta por Jayuya. Fuimos al pueblo. Mi acompañante estaba buscando un sitio para hacer un escalamiento y decía, además, que tenía que hacer una evolución." Contestó el testigo que eso se lo dijo en el camino y después en el sitio que "eso fue en el camino cuando entramos al sitio donde él iba a cometer el escalamiento". Declaró que vio lo que el acusado llevaba en el bulto en el trayecto que había entre el sitio donde se iba a cometer el escalamiento al sitio donde él detuvo su automóvil; que cuando el acusado regresó de la tienda después de los tiros traía el revólver en la mano; que el acusado no montó paquetes en el asiento donde se sentó; que vio lo que había en el baúl del automóvil, una caja de cigarros con botellas de ron y anís; que el acusado le dijo que eso lo había traído él cuando abrieron el baúl para desmontar la goma de repuesto que esa caja la puso el acusado en parte de un monte; que no sabe a quien le disparó el acusado pero que si sabe que le disparó a un bulto que pasaba y que el bulto caminaba como la figura de una persona.

Declaró además que al decir en la declaración jurada que abrió el baúl cuando el acusado regresó al automóvil después de los tiros, quiso decir que abrió el baúl en cuanto a la cerradura porque no tenía llave, pero que él no abrió el baúl levantando la tapa; que el acusado fue al establecimiento y regresó del automóvil trayendo la barra y el destornillador y la tiró debajo del asiento y "regresó para atrás y cuando regresó para atrás fue que ocurrieron los disparos"; que por el cristal de la parte trasera del automóvil vio los otros dos disparos; que al declararle al fiscal que vió al acusado traer al automóvil la caja con la mercancía fue posiblemente una equivocación; que es cierto que cuando el acusado lo contrató para que lo llevara a Jayuya le dijo que él, el acusado, iba a hacer un trabajito pero que no conocía

la clase de trabajito que iba a hacer el acusado. En una parte del contrainterrogatorio contestó:

"P. ¿Sabía usted que iba a cometer un escalamiento?

R. Cuando él me lo dijo, sí.

P. ¿Usted lo esperó?

R. Sí, señor. No en el sitio donde él cometió el hecho, sino que me fui más adelante porque como iba en un estado que no podía hacer nada bien.

P. Usted sabía que él iba a cometer un escalamiento?

R. Sí, señor.

P. Y lo esperó allí?

R. Lo esperé más arriba.

P. Y cuando trajo la mercancía del robo, ¿dónde la puso?

R. La puso en el carro. Se encontró en el carro. La ví en el carro en el momento que fui a montar la goma, y cuando la ocupó la policía y cuando se trajo aquí. Fueron las tres veces que ví la mercancía."

La otra prueba presentada en el juicio consiste en los testimonios que resumimos a continuación:

El *Dr. José A. Castro* declaró que para el 25 ó 26 de mayo de 1961 practicó la autopsia en el cadaver de Narciso Vélez Santiago por orden del Fiscal Efraín Ruiz. Presentaba una herida de proyectil con orificio de entrada al nivel del tercer espacio intercostal y orificio de salida a nivel del décimo espacio intercostal en la espalda. La bala interesó el pulmón y la aorta. La herida era mortal. La causa de la muerte fue un shock o colapso cardio-vascular debido a hemorragia masiva causada por la perforación de la aorta y segmento del pulmón izquierdo. Presentaba además el cadaver otro orificio de entrada de un proyectil que se alojó a dos centímetros del ombligo. Extrajo ese proyectil, lo marcó con lápiz anaranjado y se lo envió al fiscal. Identifica el proyectil que estaba guayado por un lado.

*Herminia Colón,* declaró que tiene un negocio en el barrio Don Alonso de Utuado, en la carretera que conduce de Utuado a Florida; la noche del 24 de mayo cerró su negocio una puerta con tranca por dentro y por fuera una cerradura

y candado. El negocio tiene dos puertas por el frente. Como a las cuatro de la madrugada del 24 al 25 de mayo fueron a llamarla a su casa Martín Rubert y Heraclio Andújar. Se dirigió a su negocio y encontró una puerta entreabierta y el candado abierto en el piso, lo habían forzado; que a la orilla de la carretera, como a unos once pies estaba el cuerpo de Narciso Vélez; encontró unas cajas de ron, de salchichón y chiclets y otras cosas puestas en la entrada, al lado de la puerta. Esa mercancía la había dejado debajo del mostrador, en los aparadores y en la trastienda; no dio instrucciones a nadie para que se moviera esa mercancía de donde ella la había dejado. Notó que no había faltado nada en su tienda que lo que se iban a llevar estaba todo allí. Declaró además que el cadáver de Narciso Vélez tenía en las manos un machete, y una lima y al lado había un mechón para alumbrar que estaba apagado.

*Wilfredo Cuadra López* declaró que para la noche del 24 de mayo atendía una estación de gasolina en Buchanan y despachó esa noche entre siete y siete y media, gasolina y aceite a Pedro Cintrón que fue allí en compañía del acusado. Fue éste quien pagó los $4.15, importe de la venta. Luego se marcharon. La próxima noche volvió a ver al acusado cuando la detective lo llevó allá; conocía de vista a Pedro Cintrón pero no conocía al acusado, ni lo había visto antes; que cuando la detective llevó al acusado a su presencia no lo reconoció al mirarlo sin sombrero pero lo reconoció cuando le pusieron el sombrero.

*Benjamín Rivera Candelaria* declaró que es agricultor y chauffeur y se dedicaba a transportar obreros desde el barrio Don Alonso a Caonillas; que entre los obreros que transportaba estaba el interfecto Narciso Vélez Santiago y lo recogía frente a la tienda de doña Herminia Colón en la carretera que conduce de Utuado a Florida; que en la madrugada del 25 al 26 de mayo, notó un vehículo estacionado como a 40 ó 50 pies de la tienda de doña Herminia; era un

automóvil color blanco y rojo, Chevrolet Bel Air de 1957 y estaba con las luces apagadas; que no recogió al obrero Narciso Vélez porque cuando pasó frente a la tienda no estaba allí; que al regresar como a los cinco minutos de Caonillas vio frente a la tienda a dos obreros de los que él conducía y a Narciso Vélez tirado en la brea; que el automóvil que había visto estacionado cerca de la tienda ya no estaba allí; que las dos personas que vio allí eran Martín Rubert y Heraclio Andújar; que una de las puertas de la tienda hecha de dos hojas, tenía una hoja abierta; que Narciso Vélez estaba muerto; tenía una mancha de sangre en la nariz y otras manchas de sangre por el vientre. Declaró además que se cruzó con Miguel Girona cuando salió de Caonillas, como a medio kilómetro de la tienda de doña Herminia; que Girona era entonces chauffeur y ahora es policía; que no habló con Girona cuando se cruzaron.

*Miguel Girona* declaró, en síntesis, que para el 24 de mayo se dedicaba a transportar obreros del Lago de Caonillas de Utuado a Barceloneta y que pasaba a las cuatro o cuatro y veinte de la madrugada por la ruta de Don Alonso en dirección hacia Utuado; que en la madrugada del 24 al 25 de mayo como a 75 metros de la tienda de doña Herminia se cruzó con un automóvil color blanco y negro, Bel Air de 1957, que venía en dirección contraria a la suya; que ese automóvil se detuvo completamente en el paseo de la carretera dejando encendidas las luces de larga intensidad y cuando el testigo pasó, ese vehículo siguió su marcha; que como al minuto llegó frente a la tienda de doña Herminia donde vió a Narciso Vélez tirado en la orilla, botando sangre por la espalda; que en esos momentos no vio a ninguna otra persona allí; que como el testigo estaba solo, siguió para buscar a alguien que viniera a ver lo que había ocurrido; que siguió hacia Utuado, después volvió a Florida; que cuando regresó a Florida el Sargento lo estaba esperando; que cuando regresó de Caonillas volvió a pasar frente a la tienda y ya había gente allí; que le dijo a

Benjamín Rivera y a Heraclio que él lo había visto pero que no se había bajado porque estaba solo y pensaba buscar a uno de ellos; que después siguió para Barceloneta con el propósito de llevar a unos obreros y ver si podía ver de nuevo el Chevrolet que había visto antes de llegar a la tienda.

*Carmelo Méndez Rodríguez*, Sargento de Policía prestando servicios en Arecibo, declaró que intervino en la investigación de este caso, consistiendo su intervención en que condujo al acusado en un automóvil para localizar un sitio en el barrio Pugnado donde él alegaba que había dormido la noche anterior; que al llegar a la carretera 643 que pasa por el barrio Pugnado a Manatí, el acusado vio un letrero que decía "Pugnado" y le dijo "Mire el letrero allí"; que caminaron como 4 kilómetros por la carretera del barrio Pugnado hasta que el acusado le indicó el sitio donde había dormido; que en aquel sitio no había señales de que una persona hubiera dormido allí; que buscó un cartón que el acusado alegaba había usado para dormir y no lo encontró; que el acusado le dijo que mientras iba caminando por la salida de la carretera que conduce de Vega Baja a Morovis mandó a parar un automóvil que le dio pon; que el acusado no le describió ese automóvil ni le mencionó la persona que lo conducía.

*Martin Rubert Rivera*, declara que como a las cuatro de la mañana se dirigió a la tienda de doña Herminia para ir a trabajar; que vio la tienda abierta; que llamó a la dueña y no le respondió, que vio entonces a Narciso Vélez en la acera de la carretera botando sangre por la nariz; que como tenía miedo al ver ese muerto se dirigió más adelante donde venía Heraclio Andújar y le dijo "Ven acá, que aquí está Narciso en el suelo, parece ser que le han dado un golpe"; que él y Heraclio se fueron a buscar un sobrino que vive a la parte de atrás de la tienda.

*Heraclio Andújar* declaró que vive en el barrio Don Alonso de Utuado y conoció a Narciso Vélez. Sabe que Narciso durmió

en casa de su hermano y como a las cuatro de la mañana lo vio muerto frente a la tienda de doña Herminia.

*Félix López Rodríguez* declaró que es Policía Estatal y prestaba servicios en Arecibo, en la patrulla que hace la ruta de Arecibo a Vega Alta; que como a las seis menos diez minutos de la mañana del 24 al 25 de mayo de 1961 recibieron él y su compañero el policía Héctor Salazar un mensaje por radio de "que venía un 'carro' crema y rojo, Chevrolet Belair del '57, que venía con dirección a salir a la carretera número dos, de Ciales a la carretera número dos". Detuvieron dicho automóvil al salir de la carretera de Ciales; que ese automóvil no se detuvo en un rótulo que dice "pare"; que al bajar el acusado, quien iba en el asiento al lado del chauffeur, notó un revólver y procedió a ocuparlo; que tenían conocimiento por el mensaje de que habían matado a uno; que el revólver estaba debajo del asiento del acusado y tenía cabo de pasta negra; estaba cargado con cinco balas; ocupó además una caja con 36 balas y un casquillo de bala, unos guantes y un "*flashlight*"; "que eso estaba dentro de una bolsita" al lado del acusado debajo de su asiento; también ocuparon una barra de uña y un destornillador; que examinó el baúl del automóvil y en el mismo había "una repuesta vacía bloada"; que el otro policía encontró la barra y el destornillador debajo del asiento del chauffeur, donde el chauffeur pone los pies; que le preguntó al acusado de quién eran esos objetos y contestó que no sabía.

*Camilo Arcelay Rivera* declaró que es experto en balística del Laboratorio de la Policía de Puerto Rico hace más de ocho años; que en mayo o junio de 1961 practicó estudios con el revólver y el plomo presentado en evidencia; que hizo varios disparos de prueba con ese revólver usando balas de las que contenía la cajita que le envió el fiscal y que son idénticas a las mismas que usaron cuando dispararon el arma de fuego; o sea la misma marca, el mismo calibre y el mismo modelo; que la característica general del plomo que se le sometió para

el estudio y la característica general de los plomos obtenidos en los disparos de prueba, era idéntica; que se "refiere a la dirección de las estrías y dirección de relieve y al ancho de la estría y al ancho del relieve"; que el plomo que se le sometió para estudio tiene una "afeitadura"; que esa "afeitadura" se produce cuando el cañón del arma de fuego "no está en correcta alineación con el cilindro o maza de dicha arma, o sea, que no entra el plomo correctamente al centro del cañón; entonces cuando pasa a ese cañón, se desprende gran parte de la cantidad de plomo que produce esa afeitadura", que en los plomos correspondientes a las balas de prueba que utilizó se produjo una afeitadura similar a ésa; que el revólver que disparó el plomo sometido para estudio tiene el defecto que ha mencionado y que produce la afeitadura; que hizo un estudio del casquillo que le sometió el fiscal, comparándolo en el microscopio con los casquillos de las balas disparadas como prueba, y llegó a la conclusión que ese casquillo fue disparado por el revólver presentado en evidencia. En la repregunta el testigo declaró que no puede asegurar que el plomo sometídole para estudio fuera disparado por el revólver pero sí puede decir que el revólver que disparó ese plomo tiene el mismo defecto que el revólver presentado en evidencia; que cuando se fabrica un cañón de un arma de fuego se usa originalmente una pieza para hacer el orificio de un extremo a otro de acuerdo con el calibre que se desea y también se usan varios instrumentos para suavizar el cañón, se producen muchísimas características microscópicas que son las que quedan grabadas en los plomos que pasan por ese cañón; que son un conjunto de características que se estudian en el plomo sometido a estudio y en el plomo de prueba; que cuando se hacen disparos con armas de fuego defectuosas, como la presentada en evidencia, se producen muchas características accidentales que alteran las características individuales del plomo "y una vez que se alteran esas características individuales del plomo, que tienen que ser las tres cuartas

partes, entonces no se puede llegar a la conclusión que fue o no disparada. En este caso posee las mismas características generales; posiblemente hayan algunas características individuales, pero no suficientes para decir en forma específica que fue disparado por dicha arma de fuego". Que aun en esas condiciones el plomo sometido a estudio tuvo algunas características individuales similares a la de los plomos de prueba.

■ Convenimos en que el testigo Pedro Cintrón Adorno era un cómplice del acusado en la comisión del delito de escalamiento en primer grado. En *Pueblo* v. *Montalvo Acevedo*, 83 D.P.R. 727 (1961), dijimos a la página 729: "A los fines de la necesidad de prueba de corroboración hemos indicado que cómplice es aquél que con pleno conocimiento y voluntariamente—sin que medie coacción—'de su libre albedrío e intencionalmente, participa en alguna forma en la comisión de un delito, pudiendo, por tanto, procesársele por el mismo.' En otras palabras, es esencial que el cómplice esté sujeto a ser encausado por el mismo delito que la persona acusada. *Pueblo* v. *Adorno*, 81 D.P.R. 518 (1959) (soborno); *Pueblo* v. *De Jesús*, 73 D.P.R. 752, 761–2 (1952) (bolita); *Pueblo* v. *Rosado*, 72 D.P.R. 827 (1951) (delito contra natura); *Pueblo* v. *Collazo*, 38 D.P.R. 991 (1928) (perversión de menores); *Pueblo* v. *Millán*, 35 D.P.R. 889, 898 (1926) (violación)."

■ Por lo menos después que salieron de Jayuya por la carretera que conduce al barrio Don Alonso de Utuado, el testigo Cintrón Adorno, conductor del vehículo, tenía conocimiento de que su acompañante intentaba cometer un escalamiento. A pesar de ello lo condujo hasta el establecimiento de doña Herminia Colón, sin que fuera amenazado o coaccionado por el acusado y luego le esperó cerca de aquel sitio hasta que el acusado regresara después de cometido el escalamiento para continuar el viaje en su compañía, como lo continuó hasta que fueron detenidos por la policía. Dicho testigo ayudó al acusado en la comisión del escalamiento pues es indudable que le ayudó

a huir de la escena del crimen y esto lo convierte en un coautor de dicho delito sujeto a ser encausado por su comisión al igual que el acusado. Es, por tanto, a los fines de la corroboración un cómplice. *People* v. *Martin,* 275 P.2d 635; *People* v. *Grischott,* 237 P.2d 712; *People* v. *Bonilla,* 12 P.2d 64; *Weston* v. *Commonwealth,* 2 Atl. 191; *Commonwealth* v. *Biddle,* 50 Atl. 262.

¿Es dicho testigo igualmente un cómplice del acusado en la comisión del delito de asesinato?

■ La prueba demuestra, aunque no con mucho vigor, que entre el acusado y el testigo Cintrón Adorno hubo un acuerdo para cometer el escalamiento. Cuando el acusado se encontraba cometiendo el escalamiento se acercó al sitio una persona y entonces el acusado le hizo varios disparos de revólver, matándola. Dicha muerte está íntimamente relacionada con el escalamiento. Se infiere del propio testimonio de Cintrón Adorno que el acusado fue de hecho sorprendido por una persona mientras realizaba el escalamiento y que al notarse descubierto disparó su revólver contra esa persona. Hay indicios en la prueba además de que el acusado en aquel momento todavía no había sacado de la tienda los frutos del escalamiento pues la mercancía removida de su sitio de costumbre fue encontrada cerca de la puerta que había sido abierta. Bajo todas estas circunstancias tenemos que concluir que se trata de una muerte cometida al perpetrarse un escalamiento. Siendo ello así, los autores o principales en la comisión del escalamiento son igualmente responsables criminalmente del asesinato perpetrado al cometerse el escalamiento, bajo la doctrina de que cuando una persona se combina con otra para cometer un acto ilegal, cada una de ellas es responsable criminalmente por los actos de su socio cometidos al ejecutarse el designio común. 1 Wharton *Criminal Law & Procedure,* sec. 251, (12 ed. 1957); Anotación a la pág. 193 de 68 L.R.A.; *Callahan* v. *State,* 71 S.E.2d 86; *Commonwealth* v. *Lowry,* 98 A.2d 733; *White* v. *State,* 228 S.W.2d 165;

*Bright* v. *State*, 232 S.W.2d 53. Generalmente no es esencial que la comisión de un asesinato forme parte del plan original, si dicho asesinato es o puede ser una de las consecuencias probables o previsibles de la ejecución del acto ilegal. Véase, Wharton *On Homicide*, sec. 439 (3 ed. 1907); *Weston* v. *Commonwealth*, supra; *Commonwealth* v. *Lussier*, 128 N.E.2d 569. Una persona que es un principal o coautor en un delito de escalamiento del que resulta un asesinato, puede ser convicta de este último delito a pesar de que otro coautor del escalamiento fue el que hizo el disparo fatal. *People* v. *Simmons*, 172 P.2d 18; *People* v. *Machado*, 309 P.2d 903. Consideramos, que de acuerdo con las circunstancias específicas que concurren en este caso, el testigo Cintrón Adorno era un cómplice en la comisión del asesinato.

¿Hubo prueba de corroboración del testimonio del cómplice Cintrón Adorno? Eliminado su testimonio, la prueba establece en resumen, los siguientes hechos:

1—Como a las siete de la noche del día 24 de mayo de 1961, el acusado fue visto en compañía de Pedro Cintrón Adorno, en un garaje de gasolina en Buchanan, donde se detuvieron a provisionar de gasolina y aceite el automóvil en que ambos viajaban. (Testimonio de Wilfredo Cuadra López.)

2—Entre nueve y media y diez de esa noche el acusado fue visto en unión a Cintrón Adorno en un café en el pueblo de Manatí. (Testimonio de Víctor Burgos Otero.)

3—Como a las cuatro de la madrugada del 24 al 25 de mayo del mismo año, fue visto un automóvil marca Chevrolet, Bel-Air de 1957, color blanco y rojo, estacionado cerca de la tienda de doña Herminia Colón, situada en el barrio Don Alonso de Utuado. (Testimonio de Benjamín Rivera Candelaria.)

4—Que ese vehículo se cruzó en la carretera con otro conducido por Miguel Girona y que como al minuto Girona llegó frente a la tienda de doña Herminia y allí vio al obrero

Narciso Vélez tirado en la orilla de la carretera. botando sangre. (Testimonio de Migual Girona.)

5—Que una de las puertas de entrada de la dicha tienda había sido violentada y abierta y cierta mercancía había sido removida de su sitio y colocada cerca de la puerta violentada. (Testimonio de Herminia Colón.)

Que frente a la tienda aparecía el cadáver del obrero Narciso Vélez. Tenía en las manos un machete y una lima y a su lado había un mechón apagado. (Testimonio de Herminia Colón, Benjamín Rivera Candelaria, Miguel Girona, Martín Rubert y Heraclio Andújar.)

6—Que el obrero Narciso Vélez recibió dos heridas de bala, una con orificio de entrada y salida y la otra con orificio de entrada solamente. Se le extrajo el plomo de esta segunda herida y le fue entregado al fiscal. La otra herida causó la muerte de dicho obrero. (Testimonio del Dr. José A. Castro.)

7—Como a las seis menos diez minutos de esa mañana, la policía detuvo en la salida de la carretera de Ciales hacia la carretera número dos, un automóvil marca Chevrolet, Bel Air, de 1957, pintado de crema y rojo y en dicho automóvil viajaban únicamente el acusado y el conductor del vehículo Pedro Cintrón Adorno. (Testimonio del policía Félix López Rodríguez.)

8—Debajo del asiento del acusado la policía ocupó en ese vehículo un revólver cargado con cinco balas, una caja conteniendo 36 balas y un casquillo de bala, unos guantes y un *flashlight*. También ocuparon una barra de uñas y un destornillador en el sitio donde el chofer descansa los pies. En ese momento el acusado dijo que no sabía a quien pertenecían esos objetos. (Testimonio de López Rodríguez.)

9—Como el acusado alegó que la noche anterior había dormido en el barrio Pugnado de Manatí, la policía lo acompañó al sitio donde él decía que había dormido y no encontró señales de que en aquel sitio hubiese dormido alguna persona.

(Testimonio del Sargento de la Policía, Carmelo Méndez Rodríguez.)

10—Del estudio que se hizo del plomo extraído del cuerpo del interfecto Narciso Vélez y del revólver ocupado al acusado, un experto en balística del Laboratorio de la Policía de Puerto Rico, concluyó que los plomos de prueba disparados por dicha arma presentaban la característica general y algunas de las características individuales que presentaba el plomo encontrado en el cuerpo del interfecto. El revólver que disparó el plomo sometido a estudio tenía el mismo defecto en la alineación del cañón y la maza, que el revólver ocupado al acusado. Concluyó además que el casquillo de bala ocupado al acusado fue disparado por el revólver que también se ocupó a dicho acusado. (Testimonio de Camilo Arcelay Rivera.)

■ ¿Conecta esta prueba al acusado con la comisión de los delitos de escalamiento y asesinato imputádosle?

■ Examinemos primero la prueba sobre el delito de escalamiento. Se establece fuera de dudas que en la madrugada del 25 de mayo de 1961 alguien, sin el permiso o consentimiento de la dueña, violentó el candado de una puerta del establecimiento comercial de doña Herminia Colón, sita en el barrio Don Alonso de Utuado, penetró en su interior y removió de su sitio mercancía de la que allí había y la colocó cerca de una puerta abierta. Esto puede ser suficiente para establecer el *corpus delicti.* (¹) En horas de la madrugada de

---

(¹) En un caso como el presente son elementos esenciales del delito de escalamiento, 1) la penetración ilegal en una de las estructuras enumeradas en la ley, y 2) que dicha penetración se verificó con la intención específica de cometer hurto o ratería. Sin embargo, "el ministerio público no tiene que probar con evidencia directa esos dos elementos del delito de escalamiento". Tanto la penetración ilegal como la existencia de una intención específica de cometer hurto o ratería son hechos que pueden ser demostrados mediante evidencia circunstancial, es decir, por inferencias razonables que surgen del conjunto de hechos y circunstancias probados. *Pueblo* v. *Torres,* 81 D.P.R. 678, 681 (1960). En este caso, el *corpus delicti* quedó además probado con el testimonio de Cintrón Adorno. Los

ese día fue visto estacionado cerca de dicho establecimiénto un automóvil Chevrolet, Bel Air de 1957, pintado de blanco y rojo. Cerca de dos horas después la policía detiene a la salida de la carretera de Ciales a la carretera número dos, un automóvil marca Chevrolet, Bel Air de 1957, color crema y rojo y que corresponde por tanto a la descripción del automóvil que estaba estacionado cerca del establecimiento escalado. En ese automóvil viajaban únicamente el acusado y el conductor del vehículo. Los objetos ocupados en ese momento en dicho vehículo—revólver, caja de balas, guantes, *flashlight*, barra de uña y destornillador, son objetos que generalmente usan los escaladores. Si se considera además el hecho de que resulta falsa, o que no hubiera indicios de que el acusado durmió la noche anterior en el sitio que había indicado en el Barrio Pugnado, ni que sea cierto que un desconocido le dio "pon"; puede concluirse que dicha prueba conecta al acusado con la comisión del delito de escalamiento, aunque por sí sola es insuficiente para establecer su culpabilidad. Una declaración falsa dada por el acusado con el propósito de establecer una coartada es un indicio de su culpabilidad. *Commonwealth* v. *Homeyer*, 159 A.2d 743; *Commonwealth* v. *Jones*, 19 A.2d 389; *Commonwealth* v. *Spardute*, 122 Atl. 161; *Commonwealth* v. *Jones*, 146 Atl. 905.

Aun suponiendo que la prueba presentada en el juicio, eliminando la declaración del cómplice, sea igualmente insuficiente para sostener la convicción del acusado por el delito de Asesinato en Primer Grado, dicha prueba le conecta con la comisión del referido delito.

■ Aparte de que un automóvil que responde a la descripción del vehículo en que viajaba el acusado al ser detenido

---

elementos del delito pueden establecerse con el testimonio no corroborado de un cómplice. La prueba de corroboración que se exige es aquélla que conecta al acusado con la comisión del delito. *Pueblo* v. *Adorno*, 81 D.P.R. 518, 546 (1959); *People* v. *Harper*, 156 P.2d 249; *People* v. *Negra*, 280 Pac. 354; *People* v. *Griffin*, 219 P.2d 519; *People* v. *Briley*, 48 P.2d 734; *People* v. *Knowles*, 242 Pac. 508.

por la policía, fue visto cerca del lugar del crimen y que dicho automóvil se cruzó con otro cerca de dicho lugar minutos después de aparecer el cadáver de Narciso, se estableció el hecho de que el revólver ocupado al acusado había disparado un casquillo de bala que también se le ocupó y que el plomo encontrado en el cuerpo de Narciso Vélez, quien apareció muerto cerca del establecimiento escalado, tenía la característica general y algunas características individuales de los plomos de prueba disparados con el revólver ocupado al acusado, y así mismo que uno de los plomos que hirió a Narciso Vélez fue disparado por un revólver que tenía el mismo defecto que presentaba el revólver ocupado por el acusado, es suficiente, a nuestro juicio, para conectar al acusado con la muerte del susodicho Narciso Vélez. *People* v. *Trujillo*, 194 F.2d 681; *People* v. *Henderson*, 209 P.2d 785; *Starks, et al.* v. *State*, 34 So. 687.

■ Si bien la prueba de corroboración debe levantar algo más que una mera sospecha contra el acusado, no es necesario que vaya tan lejos como para establecer por sí misma y sin la ayuda del testimonio del cómplice, que el acusado cometió el delito imputádole. En repetidas ocasiones hemos dicho que no es necesario que la prueba de corroboración sea directa, ni muy fuerte, siempre que sea suficiente para relacionar al acusado con la comisión del delito. *Pueblo* v. *Adorno*, 81 D.P.R. 518 (1959) ; *Pueblo* v. *Palóu*, 80 D.P.R. 364 (1958) ; *Pueblo* v. *Portalatín*, 72 D.P.R. 152 (1951) ; *Pueblo* v. *Rosario*, 68 D.P.R. 566 (1948). Véase además, *People* v. *Harper*, supra.

■ Considerada toda esa prueba conjuntamente con el testimonio de Pedro Cintrón Adorno, la misma es suficiente para establecer la culpabilidad del acusado más allá de duda razonable.

■ Para disponer del segundo señalamiento imputándole al Tribunal sentenciador haber cometido error al declarar al apelante convicto del delito de infracción al Art. 8 de la

Ley de Armas, es innecesario entrar a considerar si la presunción que establece el Art. 14 de dicha ley al efecto de que la presencia en un vehículo de un arma prohibida será evidencia *prima facie* de su posesión ilegal por todas las personas que se encuentren en dicho vehículo al momento en que se hallare el arma, es inconstitucional. Hubo suficiente prueba de corroboración que conecta al acusado con la comisión de dicho delito, según el resumen que de la misma ya hemos hecho y de acuerdo con el testimonio de Cintrón Adorno, el acusado portaba un revólver con el cual hizo varios disparos a un ser humano que resultó ser el interfecto Narciso Vélez.

■ La impugnación del testimonio de Cintrón Adorno con la declaración jurada prestada ante el fiscal, no perseguía otro propósito que el de afectar la credibilidad de dicho testigo. Correspondía al juzgador de los hechos determinar el valor y grado de credibilidad que mereciera dicho testigo y no intervendremos en su discreción salvo en aquellos casos de parcialidad o error manifiesto, lo cual, según afirma el Procurador, ni se alega ni surge de los autos. *Pueblo* v. *Pacheco*, 83 D.P.R. 526 (1961); *Chico de la Rosa* v. *Goetz*, 90 D.P.R. 316 (1964).

*No habiéndose cometido los errores señalados, se confirmarán las sentencias apeladas.*