EL PUEBLO DE PUERTO RICO, apelado, *v.* NELSON ELIÚ SANABRIA PÉREZ, acusado y apelante.

Número: CR-81-96        Resuelto: 10 de enero de 1983

*Rafael Santiago Erans*, abogado del apelante; *Miguel Pagán, Procurador General Interino,* y *Josefa A. Román García, Procuradora General Auxiliar*, abogados de El Pueblo.

El Juez Asociado Señor Rebollo López emitió la opinión del Tribunal.

La ola de criminalidad que azota a Puerto Rico constituye —si no la más grande— una de las preocupaciones mayores de nuestra ciudadanía. En relación con dicho problema, una de las "llagas" que debemos tratar de erradicar es aquella del negocio ilícito de la venta de narcóticos, el uso de los cuales no sólo está destruyendo, literalmente, a nuestra ciudadanía —especialmente a nuestra juventud— sino que también propicia la comisión de otros delitos tales como robos, escalamientos, asesinatos, etc., ya que el adicto es capaz de cualquier cosa en su desesperación por poder conseguir el dinero para comprar la droga.

De la imperiosa necesidad que tenemos de erradicar este mal de nuestra sociedad, y en vista de que dichas transacciones por lo general se llevan a cabo en la clandestinidad, es que surgió la práctica de la utilización por parte de los organismos a cargo de hacer cumplir las leyes, de los llamados agentes encubiertos, que, como es sabido, son agentes de la Policía que, haciéndose pasar por traficantes o adictos, se "infiltran en esta subcultura" que desafortunadamente existe en nuestra sociedad.

Dicha práctica ha resultado de gran beneficio para Puerto Rico en tanto en cuanto ha permitido el poder acusar y encarcelar a miles de traficantes de drogas durante los últimos años. La misma, sin embargo, no deja de ser un tanto inquietante por cuanto implica, en la gran mayoría de los casos, que un ciudadano puede ser acusado, condenado y sentenciado a prisión por un gran número de años, exclusivamente a base de la declaración, no corroborada en cuanto a los hechos esenciales de la misma, del agente encubierto.[1]

---

[1] Naturalmente que la Regla 10, Inciso D, de las Reglas de Evidencia para el Tribunal General de Justicia de 1979 dispone que la evidencia directa de *un* testigo que merezca entero crédito es prueba suficiente de cualquier hecho, salvo que por ley otra cosa se disponga.

696

■  Es por ello que este Tribunal, a pesar de haber reconocido expresamente en el pasado la necesidad y conveniencia del uso de agentes encubiertos en la guerra contra las drogas, a través de los años ha establecido unas normas o guías con el propósito de tratar de minimizar la posibilidad de que un inocente pueda perder su libertad a base de la declaración de un agente encubierto inescrupuloso. (²)

Aun cuando no tenemos a la mano estadísticas al efecto, nos parece que podemos afirmar, sin temor a equivocarnos, que el porcentaje de condenas en casos de narcóticos —tanto por Jurado como por tribunal de derecho— es impresionante, indicativo de que nuestra sociedad y los tribunales han actuado siempre con "mano fuerte" en relación con el problema de las drogas.

Ha habido casos, sin embargo, en que la prueba presentada por el Estado nos ha causado, por decirlo así, un "mal sabor". En esas ocasiones hemos exonerado al acusado en obediencia del mandato constitucional de que cuando existe

---

(²) En *Pueblo* v. *Seda*, 82 D.P.R. 719, 733 (1961) (caso por infracción a la Ley de Bolita), señalamos que el tribunal de instancia, en los casos en que no se presenta prueba física de la supuesta venta de bolita, "debe ser muy cauteloso" en su apreciación; en *Pueblo* v. *Luciano Arroyo*, 83 D.P.R. 573 (1961) (bolita), expresamos preocupación debido a que estábamos notando que las declaraciones juradas que se presentaban para servir de base a órdenes de allanamiento contenían "expresiones estereotipadas"; en *Pueblo* v. *Ayala Ruiz*, 93 D.P.R. 704 (1966) (bolita), rechazamos lo que calificamos como testimonio "flaco y descarnado" de los agentes encubiertos; en *Pueblo* v. *Soto Zaragoza*, 94 D.P.R. 350 (1967) (bolita), invocando en forma expresa nuestra facultad inherente de supervisión de los procedimientos judiciales expresamos que no estábamos en disposición de aplicar con precisión electrónica la doctrina de no intervención con la apreciación que de la prueba hiciera el tribunal de instancia; en *Pueblo* v. *Rosario Torres*, 101 D.P.R. 840 (1973) (narcóticos), extendimos la regla de los casos de *Ayala Ruiz* y *Soto Zaragoza* a los casos de infracción a la Ley de Sustancias Controladas; en *Pueblo* v. *González del Valle*, 102 D.P.R. 374 (1974) (narcóticos), expresamos preocupación ante testimonio estereotipado relativo al "acto ilegal a plena vista", cuando de ordinario los mismos se llevan a cabo en la clandestinidad, y expresamos que recaía en el fiscal la carga de la prueba para "librar de sospechas" ese testimonio que consideramos estereotipado; y en *Pueblo* v. *Almodóvar*, 109 D.P.R. 117 (1979) (bolita), reafirmamos el deber y la necesidad de que la rama judicial fije pautas en esta clase de situaciones, aparte de las que puedan establecer las ramas legislativa y ejecutiva, para así poder lograr el debido y difícil balance entre los valores en juego.

.

una duda razonable sobre la inocencia o culpabilidad de un acusado procede la absolución del mismo. El presente caso es un ejemplo de ello. Examinemos la prueba.

Se le imputó al apelante que el día 18 de julio de 1979, alrededor de la 1:30 p.m., frente a la Plaza Las Delicias en Ponce, Puerto Rico, le vendió a un agente encubierto, de nombre Carlos De Jesús Rivera, diez bolsas (*decks*) de la droga narcótica conocida como heroína, por la suma de $200.

La prueba de cargo consistió de las declaraciones del agente De Jesús Rivera, su supervisor, el agente Heriberto Pérez Irizarry y del químico Ángel L. Toro. De Jesús Rivera declaró, en síntesis, que ese día en unión a un confidente *que sólo conoce por el apodo de Capirolo* llegó a dicha plaza y se sentaron en un banco; que no recuerda que ese día el tiempo estuviera malo; que llegó el acusado (*Nelson Eliú Sanabria Pérez*), persona que él no conocía, a quien Capirolo *se lo presentó como "Barreto"*; que el confidente le preguntó a Barreto por una persona; que éste le contestó que esa persona no se encontraba en Ponce; que ahí hablaron de la transacción; que Barreto dijo tener diez bolsas de "manteca" y que las vendía por $200; que el agente fue a su carro, a sugerencia de Barreto, y examinó las envolturas; que regresó a la plaza y le entregó los $200 a Barreto; y que se retiró con el confidente del lugar y le hizo entrega de la evidencia a su supervisor, el agente Pérez Irizarry, ese día a las 3:00 p.m. en el Cuartel de la Policía de la calle Molina en Ponce, y que identificó a Barreto, para su supervisor, *en horas de la noche, dos semanas más tarde*.

A preguntas de la defensa aceptó, al ser confrontado con un informe confidencial escrito que había rendido él ese mismo día 18 de julio de 1979, que había descrito en dicho informe al acusado conocido por Barreto como una persona *de 23 a 25 años de edad*, blanco, *de 150 a 160 libras de peso*, pelo negro largo, y *de 5'6" a 5'8" de estatura*. Confrontado el agente De Jesús con la persona del acusado, quien para la

fecha del juicio contaba con la edad aproximada *de 45 años* —habiendo nacido el 18 de noviembre de 1936, según certificado de nacimiento admitido en evidencia— y es una persona *de 5'10" de estatura*, de *180 libras de peso*, con *bigote* y con el pelo negro, *tipo curly*, explicó que no incluyó en la descripción que diera en el informe confidencial lo del bigote y lo del pelo tipo *curly* por no considerarlo necesario; que se pudo equivocar respecto a lo de la estatura debido a que, en ocasiones, estuvo sentado mientras el acusado permanecía de pie; *no ofreció ni dio explicación alguna respecto a la diferencia notable en la edad* y en cuanto al peso del acusado; y añadió que la trasacción con el apelante duró 15 minutos. Es de rigor, además, el señalar que el agente De Jesús aceptó que él había participado en tres redadas en el área de Ponce; que la del apelante fue la segunda de ellas; y que un mes antes —o sea *en junio de 1979*— de hacer la transacción con el apelante él había declarado en varios casos como testigo, en relación con la primera redada, en el Tribunal de Distrito, Sala de Ponce. La declaración del agente Pérez Irizarry, supervisor del encubierto, se limitó a corroborar el hecho de que el encubierto le había entregado diez *decks* de supuesta heroína el día 18 de julio de 1979, a las 3:00 p.m., en el Cuartel de la Policía antes indicado, evidencia que él le entregó al químico, y que dos semanas más tarde, en horas de la noche, el encubierto identificó al apelante como la persona conocida por Barreto. El químico Toro declaró que la evidencia que le fue entregada por el agente Pérez Irizarry dio positivo de la droga conocida como heroína.

La prueba de defensa fue a los efectos de que el apelante, persona que había residido tanto en los Estados Unidos de América como en Puerto Rico, nunca había sido convicto de delito alguno; que hacía años que trabajaba como empleado en un negocio conocido como *"Kentucky Fried Chicken"* en el turno de 4:00 p.m. a 12:00 de la medianoche; y que el día de los supuestos hechos, desde horas tempranas en la tarde

se había dedicado a ayudar a asegurar las puertas y ventanas del hospedaje en que vivía —hecho corroborado por el testimonio del encargado del referido hospedaje— en vista de que se aproximaba a Puerto Rico la tormenta Claudette y existía mal tiempo, consistente el mismo de fuerte lluvia y ventarrones.[3]

Con dicha prueba el Jurado que intervino en el caso rindió un veredicto de culpabilidad, sentenciando el tribunal de instancia al apelante a cumplir una sentencia de 10 a 12 años de presidio. Con posterioridad a dicho día, el tribunal de instancia le concedió al apelante una fianza en apelación.

Es correcto que reiteradamente hemos resuelto que de ordinario en ausencia de error manifiesto, prejuicio, parcialidad o pasión no intervendremos con la apreciación que de la prueba haga el Jurado. *Pueblo* v. *Turner Goodman*, 110 D.P.R. 734, 738 (1981), y *Pueblo* v. *Cruz Negrón*, 104 D.P.R. 881, 882 (1976).

En el presente caso, sin embargo, nos impacta sobremanera, *primero*, el hecho de las diferencias existentes entre la descripción plasmada en el informe confidencial y la realidad de la persona del apelante. Haciendo un gran esfuerzo podríamos considerar plausible el que el agente De Jesús se equivocara en cuanto al peso y la estatura del apelante y aceptar su explicación del porqué de la omisión de hacer constar que el apelante tenía bigote y el pelo *curly*. Lo que resulta totalmente inaceptable es que un agente de la Policía de Puerto Rico que observa a una persona *a plena luz del día y por espacio de quince minutos*, exprese que ésta, en su opinión, cuenta con una edad de entre 23 a 25

---

[3] Es de rigor señalar que la defensa intentó *infructuosamente* presentar en evidencia un recorte del periódico El Mundo correspondiente al día *19* de julio de 1979, en el cual supuestamente se hacía alusión al mal tiempo habido en el área sur de Puerto Rico debido a la lluvia que cayó en dicha área como consecuencia de la tormenta. Al no ser admitido por el tribunal de instancia, no contamos con el beneficio del mismo en apelación.

años, cuando en realidad la persona casi dobla esa edad.[4] En *Pueblo* v. *Falú Fuentes*, 102 D.P.R. 809 (1974), en donde el acusado contaba 20 años de edad, pesaba 170 libras y medía 5'10" de estatura, y el agente encubierto, en el informe confidencial, lo describió como de 29 a 35 años de edad, de 149 libras de peso y 5'5" de estatura, dijimos:

> *Aceptamos que una persona pueda equivocarse al calcular la edad, peso y estatura de otro. Pero el que aquí hizo el cálculo no es una persona corriente en estos menesteres. Se trata de un agente de la Policía,* con tres años de experiencia en la persecución del tipo de delito que aquí nos ocupa, *entrenado especialmente para hacer esos cálculos y presentar informes exactos de lo que observa.* Si se tratase de pequeños errores en sus cálculos sería pasable. *Pero aquí se trata de equívocos imposibles de superar. Rivera no era aquí un casual observador de unos hechos.* El provocó la transacción con esa persona que dijo no conocer y era su deber vaciar los datos precisos en el informe que debía hacer y retenerlos para en su día prestar testimonio en el juicio que se siguiera al acusado. *La descripción de éste, por el hecho de no serle conocido hasta ese momento, tenía que ser la más exacta posible.* Jamás podría identificarse al acusado aquí apelante, un joven de 20 años de edad, de 170 libras de peso y de cinco pies diez pulgadas de estatura como el hombre que describió el agente Rivera en su informe. Añádase a eso que en el informe sobre la transacción del día primero de junio con el mismo acusado, el agente Rivera da una descripción que no coincide con la que hizo en su informe del día anterior. . . . (Énfasis suplido.) Págs. 812–813.

En *segundo lugar,* la declaración del agente De Jesús en el presente caso amerita la calificación de "testimonio flaco y descarnado", frase que acuñáramos en el caso *Pueblo* v. *Ayala Ruiz,* supra. El agente recuerda con una exactitud increíble los hechos específicos de la transacción en sí. Sin embargo, y a manera de ejemplo, no sabe o no recuerda el nombre del confidente Capirolo; no recuerda en qué sitio y a

---

[4] Recordemos, además, el hecho de que cuando el agente De Jesús identifica al apelante para su supervisor *es en horas de la noche, dos semanas más tarde,* circunstancias que pueden haber inducido al agente a cometer un error.

qué hora se encontró con Capirolo ese día 18 de julio de 1979; no sabe, o no recuerda, los nombres —sólo los apodos— de las demás personas a quienes compró narcóticos y que fueron acusados en la redada del apelante; no recuerda si el día 18 de julio de 1979 hacía buen o mal tiempo, etc.

En *tercer lugar*, resulta inquietante el hecho de que un agente de la Policía de Puerto Rico que públicamente declara durante el mes de *junio de 1979* en el Tribunal de Distrito, Sala de Ponce, en casos de drogas en relación con una redada en que él estuvo envuelto, regrese a la calle en la misma ciudad de Ponce un mes más tarde —durante *julio de 1979*— a trabajar como agente encubierto una vez más. La Policía de Puerto Rico debe evitar que situaciones como la antes señalada ocurran. Aparte de que la misma conlleva riesgos para la vida y seguridad de los agentes involucrados, ello le resta credibilidad al testimonio de dichos agentes. En adición, la Policía de Puerto Rico debe velar porque la labor de supervisión que realiza el agente supervisor del encubierto no se limite meramente a recibir la evidencia de manos de este último. Donde las circunstancias lo permitan, se debe hacer un esfuerzo para que la referida labor de supervisión sea más efectiva, haciendo lo posible para lograr que la declaración del agente encubierto sea corroborada sustancialmente por el supervisor de dicho agente. Estamos conscientes de que en muchas ocasiones ello no es factible debido a distintas razones, tales como la rapidez con que se lleva a cabo la transacción, lo imprevisible de la misma, el lugar donde se efectúa, el hecho de que, por falta de recursos, la Policía tiene que asignar un supervisor a varios agentes encubiertos, etc. Ello no obstante, repetimos, se debe hacer un esfuerzo para tratar de lograr dicho propósito.

Por las razones expresadas *procede la revocación de la sentencia apelada y la absolución del apelante. Se dictará sentencia de conformidad con lo aquí expresado.*

Los Jueces Asociados Señores Dávila, Díaz Cruz y Negrón García concurren en el resultado sin opinión.