EL PUEBLO DE PUERTO RICO, apelado, *v.* CARLOS VÉLEZ PAGÁN, acusado y apelante.

*Número:* CR-81-93     *Resuelto:* 27 de octubre de 1983

*Moisés Abreu Cordero,* abogado del apelante; *Miguel Pagán, Procurador General Interino,* y *Ricardo E. Alegría Pons, Procurador General Auxiliar,* abogados de El Pueblo.

### SENTENCIA

Un jurado produjo un veredicto de culpabilidad contra el apelante, por cargos de robo en el curso de un asalto a una cafetería en Cupey Alto, Río Piedras, y en su día fue sentenciado en el Tribunal Superior a pena de quince años de reclusión y a otras concurrentes por infracción de la Ley de Armas. En su alegato de apelación señala como errores: (1) no admitir la declaración del testigo Matos en la vista sobre supresión de identificación, para impugnarlo en el juicio; (2) **admitir** la identificación por fotografías; (3) ad-

mitir la identificación en corte por el testigo Matos Sandoval; (4) denegar la admisión de cierta prueba documental ofrecida por el acusado; (5) denegar dos solicitudes para disolución del jurado; (6) permitir el comentario del fiscal sobre ausencia del testigo de defensa Carrasquillo e incluir instrucción sobre la presunción derivada de la supresión voluntaria de la prueba; (7) no obligar la comparecencia de dicho testigo con gastos sufragados por el erario; y (8) que la prueba no estableció culpabilidad más allá de duda razonable. Ninguno de los errores fue cometido.

1. En ausencia del jurado, el juez determinó que el testigo Matos Sandoval, dueño del cafetín asaltado, no mintió al sostener ante el jurado que no recordaba ciertos particulares de su testimonio anterior en la vista de supresión de evidencia y, en consecuencia, no admitió la declaración previa para fines de impugnación. El juez adjudicó la buena fe y veracidad del testigo al hacer la determinación preliminar de admisibilidad ordenada en la Regla 9 de Evidencia. Ha sostenido este Tribunal que "[n]o puede afirmarse que, en todo caso, el testimonio de un testigo en términos de que 'no recuerda' es inconsistente con una declaración suya anterior en la que detalladamente expone los hechos". *Pueblo* v. *López Reyes*, 109 D.P.R. 379, 383 (1980).

2-3. El ofrecimiento y admisión de fotos usadas en la identificación por fotografía fue acto corroborativo y no perjudicial, pues el taxista Andino, testigo,(1) dijo conocer al apelante Vélez Pagán por el apodo de Cano Bruja hacía tres o cuatro años. (E.N.P., págs. 8 y 13.) La identificación *en corte* por el comerciante asaltado Matos Sandoval no aparece viciada de sugestividad alguna, por lo que era digna de la credibilidad que le otorgaron tanto el juez como el jurado. "[L]a fruta servida en el juicio no estaba envenenada." *Pueblo* v. *Rey Marrero*, 109 D.P.R. 739, 746 (1980).

---

(1) Su renuencia a identificar al imputado en las primeras etapas de la investigación se explica por temor a la represalia de éste, directa o por agentes.

4. Como parte de su prueba de coartada, el acusado ofreció fotocopia de un cheque endosado por él y fotocopia de la tarjeta usada para autorizar al patrono a hacer descuentos para fines de contribución sobre ingresos. Dichas piezas no cumplían con la Regla 70 de Evidencia sobre admisión de evidencia secundaria al original y el propio apelante les resta importancia al considerarlas irrelevantes. (Alegato, pág. 25 *in fine.*) Regla 5 de Evidencia.

5. Al contrainterrogar al acusado el fiscal le preguntó si al arrestarlo le habían ocupado una jeringuilla; y al declarar el agente Rodríguez dijo que, según su expediente, el acusado había sido fichado por el delito de robo. En ambas ocasiones la defensa pidió la disolución del jurado (*mistrial*) y el juez desestimó la solicitud con instrucción específica al jurado de que no debía tomar en consideración dichas manifestaciones. No hay base para pensar que estos dos incidentes "afectaron la conciencia del jurado" al punto de inclinarla contra el acusado, pues los jurados no son tan susceptibles. *Pueblo* v. *Díaz*, infra, pág. 385; y *Pueblo* v. *Hernández Santiago*, 97 D.P.R. 522, 531 y ss. (1969). En vista de la fuerte prueba de cargo, están dichas expresiones muy lejos de constituir error perjudicial. *Pueblo* v. *Díaz*, 74 D.P.R. 375, 385 (1953).

6-7. El testigo de defensa Angelo Carrasquillo viajó tres veces de New York a Puerto Rico para declarar en el juicio y cuando éste comenzó no estaba disponible. No pueden descartarse como causa de su ausencia las dos suspensiones del juicio promovidas por el acusado, y no se justificó la exigencia de que el Estado le pagara gastos de viaje. Bien pudo la defensa tomarle una deposición. Reglas 94 de Procedimiento Criminal y 64 de Evidencia. *Pueblo* v. *Ruiz Lebrón*, 111 D.P.R. 435 (1981). El argumento del fiscal, que relacionó la ausencia de dicho testigo con la presunción de que resultaría testimonio adverso (Regla 13 de Evidencia), pues era prueba voluntariamente suprimida, no parece estar totalmente infundado, y en la suma total de circunstancias

la cuestión no muestra peso o influencia decisiva en el veredicto. En este señalamiento (7) intercaló el apelante su objeción al juicio conjunto con el coacusado Julio Santiago Reyes, a lo que atribuye que el juicio se extendiera por 31 días. No alega que hubiese solicitado juicio por separado ni surge de la consolidación perjuicio o lesión apreciable. Reglas 89 y 90 de Procedimiento Criminal.

8. Hubo prueba directa y confiable de la comisión del delito y de la identificación del acusado, que sostiene sin dificultad las sentencias apeladas y excluye la duda razonable. La apreciación de esa prueba por el tribunal de instancia, juzgador de hechos, fue correcta.

*Se confirman las sentencias.*

Así lo pronunció y manda el Tribunal y certifica la Secretaria General. Los Jueces Asociados Señores Dávila y Negrón García concurren en el resultado sin opinión. El Juez Asociado Señor Rebollo López disintió con voto.

(*Fdo.*) Lady Alfonso de Cumpiano
*Secretaria General*

—O—

Voto disidente emitido por el Juez Asociado Señor Rebollo López.

El día 9 de mayo de 1981, en o alrededor de las 8:30 P.M., dos individuos perpetraron un asalto en un "cafetín" conocido como "El Nuevo Combate", ubicado el mismo en el sector Cupey Alto de Río Piedras, Puerto Rico. En adición al dueño del negocio, varios parroquianos fueron despojados de prendas y dinero. En relación con dichos hechos se radicaron acusaciones contra el aquí apelante Carlos Vélez Pagán, conocido por Cano Bruja, y un individuo de nombre Julio Santiago Reyes, conocido por Campolito, por varios cargos de robo e infracción a los Arts. 6, 7 y 8 de la Ley de Armas de Puerto Rico. Los casos se vieron ante jurado, el

cual rindió veredicto de culpabilidad, en cuanto a los dos imputados, en todos los cargos. El aquí apelante fue sentenciado por el honorable Tribunal Superior de Puerto Rico, Sala de San Juan, a cumplir una pena de quince (15) años de presidio en cada uno de los cargos por el delito de robo y la pena de cinco (5) años de presidio en cada uno de los casos por infracción a la Ley de Armas de Puerto Rico. La prueba de cargo consistió, principalmente, del testimonio oral de siete testigos, seis de ellos testigos presenciales del asalto y el agente de la División de Robo de la Policía de Puerto Rico a cargo del caso. La defensa del acusado fue la de coartada.

La prueba de cargo, respecto a *la identidad* del apelante como uno de los participantes en el asalto perpetrado, fue la siguiente:

*El primer testigo lo fue José Pilar Matos Sandoval,* dueño del negocio asaltado. En lo pertinente a la identidad de los asaltantes declaró, en síntesis, que los que perpetraron el asalto en su negocio el 9 de mayo de 1981 alrededor de las 8:30 P.M. fueron dos personas, pero él sólo pudo ver a uno de ellos, o sea, a Julio Santiago Reyes conocido por "Campolito" (E.N.P., pág. 2); luego del asalto, la "gente" comentaba que eran los "mismos dos" que habían venido al negocio el día anterior y que ese día —8 de mayo de 1981— él había visto a Julio con Carlos Vélez Pagán (E.N.P., pág. 3); que la noche de los hechos, después del asalto, él sólo le dijo a la Policía que podía identificar a uno de ellos —a Julio— pero que tampoco le dijo el nombre de éste "porque *todavía* no era *afirmativa* la identificación" (E.N.P., pág. 4); y que fue al Cuartel de la Policía el día 21 de mayo de 1981 *a ver fotos* y allí identificó a Julio Santiago. (E.N.P., págs. 3 y 6.)

*José Manuel Andino Serrano, conocido como "El Chino",* declaró que es chofer de taxi y que conoce a Julio Santiago Reyes, al que le dicen "Campolito", y que conoce "de vista", desde tres o cuatro años antes del asalto, al apelante Carlos Vélez Pagán por el apodo de "Cano Bruja" (E.N.P., págs. 8

y 13); que la noche del asalto —9 de mayo de 1981— él se encontraba en el interior del negocio cuando oyó una voz que decía que se trataba de un asalto y que se tiraran al piso y al así hacerlo él miró y vio a quien *luego* dice era "Cano Bruja" con un revólver en la mano (E.N.P., págs. 8 y 8A); que la noche antes —el 8 de mayo— él vio en el mismo negocio a Julio Santiago, pero no a "Cano Bruja" (E.N.P., pág. 9); que la noche del asalto no vio a Julio Santiago (E.N.P., pág. 13); que la noche del asalto "no les indicó [a los policías] que conociera a la persona que lo había asaltado, ni les dijo que había sido 'Cano Bruja'. Que se sentía con miedo después del asalto para declarar". (E.N.P., pág. 13); que el día 13 de mayo de 1981, Julio Santiago Reyes se le acercó en el "stand" de taxis y le dijo que lo iba a mandar a matar porque lo había "choteado" (E.N.P., pág. 9); que el 21 de mayo de 1981 fue al Cuartel a ver fotos, que no identificó persona alguna y que no le mencionó al Agente Martínez que el que lo había asaltado era "Cano Bruja", porque tenía temor por la amenaza de "Campolito" (E.N.P., pág. 10); que luego que metieron preso a "Campolito" "empezó a quitársele el miedo" y a los tres días llamó al Agente Martínez por teléfono para que se vieran porque tenía que decirle algo y que al verlo le dijo que el segundo asaltante era "Cano Bruja", el cual identificó por fotos en el Cuartel el 9 de junio de 1981. (E.N.P., pág. 11.)

*Mariano Santos* declaró que era operador de equipo pesado, que estando en El Nuevo Combate el 9 de mayo oyó voz de que era un asalto; no vio a los asaltantes; que "El Chino" —José Andino Serrano— después del asalto decía que eran las mismas personas del día anterior. (E.N.P., pág. 15.) *Pedro Sánchez*, jardinero, estaba en el negocio cuando el asalto; no vio a los asaltantes, pero sabe que eran dos, por cuanto oyó la voz de dos personas. (E.N.P., pág. 16.) *Juan Antonio Aponte*, chofer, se encontraba en el negocio; no vio a los asaltantes pero oyó la voz de dos personas; que en los días siguientes al asalto oyó al "Chino" —José Andino

Serrano— decir que los asaltantes eran los del día anterior y que a él lo habían amenazado.

*Juan Matos Sandoval*, hermano del dueño del negocio; estaba la noche del asalto *fuera* del negocio, pero sentado en una mesa *al lado* de una ventana del mismo; vio llegar a los dos asaltantes (E.N.P., pág. 18); los había visto a los dos en el negocio la noche antes, pero antes de ese día nunca los había visto (E.N.P., pág. 19); los vio perpetrar todo el asalto por la ventana al lado de la cual se encontraba y los vio irse en un carro (E.N.P., pág. 19); fue añadido como testigo por el fiscal para la vista preliminar. (E.N.P., pág. 18.)

*Agente Héctor Martínez*, agente del C.I.C.; recibió la querella el 10 de mayo de 1981 (E.N.P., pág. 21); citó a los testigos al Cuartel para el 21 de mayo y en dicho día el dueño del negocio —José Pilar Matos Sandoval— identificó por fotos a Julio Santiago Reyes (E.N.P., pág. 21); que luego celebró un *lineup* y el dueño del negocio volvió a identificar a Julio (E.N.P., pág. 22); que luego fue con todos los testigos a Fiscalía donde todos prestaron declaración jurada y luego pasó a someter el caso al juez (E.N.P., pág. 22); que pasados dos o tres días del 21 de mayo recibió llamada telefónica del "Chino", que fue a verlo, y éste le indicó sobre "Cano Bruja" (E.N.P., pág. 22); que consiguió una foto de "Cano Bruja" y el 9 de junio "El Chino" lo identificó por fotos (E.N.P., págs. 22 y 23); que luego fue con "El Chino" y los demás testigos al Centro Judicial y le sometió los casos a "Cano Bruja" (E.N.P., pág. 23); que nunca levantó las actas sobre las identificaciones realizadas por fotografías (E.N.P., pág. 24); que como a los dos o tres días de haberle sometido el caso de "Campolito" se enteró de que el hermano del dueño del negocio había visto a los asaltantes, pero en ningún momento lo notificó a Fiscalía ni llevó a dicho testigo para que prestara declaración jurada ni a ningún procedimiento de identificación (E.N.P., pág. 26); ello a pesar de que antes del 9 de junio de 1981 —día en que citó

al "Chino" para la identificación del apelante— ya supuestamente tenía conocimiento de que dicho testigo había visto a los asaltantes.

Antes de entrar propiamente en materia, debe quedar claramente establecido que el principio rector en esta jurisdicción, respecto a la materia de identificación de un acusado, lo es si ésta es o no confiable y digna de crédito, de acuerdo con la totalidad o suma de las circunstancias que rodearon la misma y que, de ordinario, el juzgador de los hechos está en mejor posición para adjudicar la credibilidad de los testigos, que un tribunal en apelación. *Pueblo* v. *Suárez Sánchez*, 103 D.P.R. 10, 21 (1974).

En *Pueblo* v. *Sanabria Pérez*, 113 D.P.R. 694, 696–697 (1983), expresamos, sin embargo, que hay casos en "que la prueba presentada por el Estado nos ha causado, por decirlo así, un 'mal sabor'. En esas ocasiones hemos exonerado al acusado en obediencia del mandato constitucional de que cuando existe duda razonable sobre la inocencia o culpabilidad de un acusado procede la absolución del mismo".

La totalidad de las circunstancias que rodean la prueba de cargo en el presente caso, respecto *a la identidad* del apelante como uno de los participantes en el asalto perpetrado, causa en nosotros el "mal sabor" de que hablamos en el caso de *Sanabria Pérez*, supra. Ninguno de los testimonios *de los dos testigos* que señalan o identifican al apelante como uno de los participantes en el asalto, examinados dichos testimonios individual o conjuntamente, produce en nuestro ánimo esa sensación de tranquilidad que lleva al convencimiento, en un ánimo no prevenido, de que ha quedado demostrada la culpabilidad del acusado más allá de duda razonable. En adición a lo anteriormente expresado, *las circunstancias* que rodean dichos testimonios nos llevan a dudar de la confiabilidad de la identificación realizada, lo que nos mueve a disentir en el presente caso, no obstante la sabia y vigente norma expuesta en el caso de *Suárez Sánchez*, supra, de abstención, con la apreciación que de la

credibilidad de los testigos realiza el juzgador de los hechos en instancia.

Del resumen que de la declaración de los testigos hiciéramos anteriormente se puede hacer la inferencia razonable de que los testigos que se encontraban *dentro* del establecimiento asaltado tuvieron muy poca oportunidad de poder observar a los asaltantes; ello posiblemente debido, en adición al nerviosismo normal de una víctima, a que fueron instruidos por los asaltantes para que se acostaran en el piso. Salta a la vista el hecho de que los testigos Mariano Santos, Pedro Sánchez y Juan Antonio Aponte no pudieron observar a ninguno de los dos asaltantes y que el dueño del negocio, José Pilar Matos Sandoval, sólo pudiera observar a uno de ellos, al igual que el testigo José Manuel Andino Serrano. Dicha inferencia o conclusión cobra fuerza cuando consideramos, adicionalmente, que el agente investigador del caso, una vez entrevista a los testigos, entiende necesario el que Matos Sandoval y Andino Serrano sean sometidos, como hemos visto, a los procedimientos de identificación que regulan nuestras Reglas de Procedimiento Criminal.[1]

Ahora bien, no empece lo anteriormente expresado, el testigo Andino Serrano insiste en que él pudo determinar que se trataba del apelante, a quien supuestamente conocía "de vista" por tres o cuatro años. ¿Es confiable o merece crédito dicho testimonio? Veamos.

Dicho testigo no informa ese hecho a los agentes de la Policía de Puerto Rico que acuden la noche de los hechos al establecimiento asaltado, supuestamente, porque sentía temor esa noche. Tampoco lo informa el 21 de mayo de 1981 cuando acude, junto a los demás testigos del caso, al Cuartel de la Policía de Puerto Rico a invitación del agente Martínez para ver fotos. En esta ocasión, supuestamente, debido a que Julio Santiago Reyes lo había amenazado por haberlo

---

[1] Recordemos que el dueño del negocio declaró que la noche de los hechos "todavía no era afirmativa la identificación", ello en cuanto a Campolito.

"choteado", hecho que contrasta con su testimonio a los efectos de que no había dicho a nadie que él sabía quiénes eran los asaltantes. Tampoco lo informa al fiscal a cargo del caso, cuando el agente Martínez lleva a éste y a los demás testigos a la fiscalía del distrito para prestar las correspondientes declaraciones juradas. Por último, tampoco lo informa al magistrado que determina causa probable ese día contra Julio Santiago Reyes. Es correcto que se podría argumentar que era razonable que no lo hiciera, por cuanto había sido amenazado y sentía fundado temor. Sin embargo, no podemos olvidar el hecho de que si hubiera hablado en ese momento, ambos acusados —no sólo Julio Santiago Reyes— hubieran sido acusados y arrestados. En el mes de junio de 1981 —por supuestamente habérsele empezado a quitar el miedo— se comunica con el agente Martínez y procede a identificar por fotografías al apelante.

Consideramos procedente, en este momento, destacar un hecho que hace que cobre fuerzas nuestra intranquilidad respecto al presente caso. No hay explicación en la prueba del porqué el agente Martínez, al supuestamente ser informado por el testigo Andino Serrano que sabía quién era el segundo asaltante, no somete a este sospechoso a una rueda de detenidos (*lineup*) y por el contrario, únicamente procede con la identificación por fotografías. En *Pagán Hernández v. Alcaide*, 102 D.P.R. 101 (1974), expresamos que la identificación de un sospechoso mediante fotografías es un método en el cual puede dependerse *exclusivamente* tan sólo en situaciones donde sea imperioso su uso.

Tenemos, adicionalmente, que el agente Martínez, al someter el testigo Andino Serrano al procedimiento de identificación por fotografías, *no* cumple con lo dispuesto en la Regla 252.2 de las de Procedimiento Criminal de Puerto Rico al no levantar el acta que requiere dicha regla. Es correcto que en *Pueblo v. Rivera Navarro*, 113 D.P.R. 642, 651 (1982), —caso de "rueda de detenidos"— expresamos que la no preparación del acta "no significa que automáti-

camente todo el proceso esté viciado". Sin embargo, expresamos en el mencionado caso, que el hacerlo es una "*garantía más* de que la Policía ha cumplido satisfactoriamente los requisitos germanos *dirigidos a salvaguardar la confiabilidad* en el proceso de identificación penal". (Énfasis suplido.)

La versión ofrecida por el segundo testigo —Juan Matos Sandoval— que supuestamente también puede identificar al apelante como uno de los asaltantes, todavía es más difícil de creer. En adición, las circunstancias que rodean la producción de su testimonio en corte no deben ser sancionadas por un tribunal de justicia. Como hemos visto, según el testimonio de este testigo, él se encontraba, supuestamente, localizado fuera del negocio, convenientemente sentado en una mesa al lado de una ventana. No se aleja de la misma, lo que le permite observar todo el asalto desde el momento en que los asaltantes llegan al negocio hasta que se alejan del lugar. Declara que a dichos asaltantes los había visto la noche anterior en el mismo negocio, pero que antes de ese día jamás los había visto. Dicho testigo no informa nada de lo anteriormente relatado a los agentes de la Policía de Puerto Rico que esa noche atienden la querella; no se sabe por qué razón. El agente Martínez se entera —no se sabe cómo— unos días *antes* del 9 de junio de 1981, que esta persona, supuestamente, puede identificar a los asaltantes. No se informa a la fiscalía del distrito de ese hecho. No es sometido el testigo a ningún proceso de identificación, ni tan siquiera el día 9 de junio de 1981, cuando el agente Martínez somete al testigo Andino Serrano al proceso de identificación por fotografías, que culmina en la identificación del apelante por Andino Serrano. El testigo Matos Sandoval no es llevado ante el juez que determina causa probable contra el aquí apelante el día 9 de junio de 1981. Nunca se le toma una declaración jurada por el fiscal. Dicho testigo aparece, como por arte de magia, en la vista preliminar de los casos. Situaciones como ésta no deben ser

toleradas. Este caso nos produce la impresión de que fue, en lo referente al aquí apelante, "haciéndose sobre la marcha".

Estamos conscientes de que se puede argumentar que hay prueba en el récord que "sostenga" el veredicto rendido por el juzgador de los hechos, como la hay posiblemente en todos los casos, no importa la calidad de la misma. Dicha prueba, sin embargo, nos causa una seria duda; esa que se conoce en nuestro ordenamiento jurídico como la "duda razonable". Los jueces tenemos el derecho a dormir tranquilos; confirmar las sentencias apeladas nos lo impediría. Es por ello que entendemos que dichas sentencias deberían ser revocadas.