EL PUEBLO DE PUERTO RICO, apelado, *v.* CARLOS MATTEI SANTIAGO, acusado y apelante.

*Número:* CR-88-23       *Resuelto:* 23 de noviembre de 1992

*Carmelo Pestaña Segovia,* abogado del apelante; *Norma Cotti Cruz, Subprocuradora General,* y *Blanca Díaz Segarra, Procuradora General Auxiliar,* abogadas de El Pueblo.

## SENTENCIA

Estudiados y analizados los autos originales, la exposición narrativa de la prueba y los alegatos de las partes, *se dicta sentencia que revoque la emitida por el foro de instancia.*

Así lo pronunció y manda el Tribunal y certifica el señor Secretario General. El Juez Asociado Señor Rebollo López emitió una opinión concurrente. La Juez Asociada Señora Naveira de Rodón emitió una opinión concurrente, a la cual se unieron el Juez Presidente Señor Andréu García y el Juez Asociado Señor Hernández Denton. El Juez Asociado Señor Fuster Berlingeri emitió una opinión disi-

---

dente, a la cual se unieron los Jueces Asociados Señores Negrón García y Alonso Alonso.

(*Fdo.*) Francisco R. Agrait Lladó
*Secretario General*

**— O —**

Opinión concurrente emitida por el Juez Asociado Señor Rebollo López.

Atendida la relación imparcial que de los hechos se hace en la ponencia emitida por la compañera Juez Asociada Señora Naveira de Rodón —la cual relación de hechos, dicho sea de paso, es la que un examen objetivo del expediente revela que es la correcta— *concurrimos* con el dictamen mayoritario que decreta la revocación de la sentencia apelada.

A nuestra manera de ver las cosas, en el presente caso *el Estado no presentó prueba de la comisión de delito por parte de persona alguna; esto es, no se demostró que alguna persona haya incurrido en conducta criminal castigable por nuestro ordenamiento jurídico.* La prueba presentada por el Ministerio Fiscal, *a lo sumo*, demostró la existencia de *una transacción comercial entre dos partes privadas y la existencia de una deuda comercial*; no, repetimos, la comisión de un acto criminoso. *No podemos permitir que el proceso criminal se utilice como una "acción sustituta" de la demanda en cobro de dinero.*

Por otro lado y asumiendo, *a los fines de la argumentación*, que en efecto se hubiera demostrado la comisión de un delito —apropiación ilegal en la modalidad de "hurto mediante treta y engaño"— la prueba presentada respecto al "responsable" del mismo no cumple con el requisito de demostrar la culpabilidad del apelante Carlos *Mattei Santiago*, más allá de duda razonable. Este *nunca* ha sido parte de la corporación Centro de Transmisiones Automáticas *ni* accionista u oficial de la misma, y su "identifica-

ción", por parte de la supuesta perjudicada, es altamente cuestionable. La prueba demostró, por el contrario, que el presidente de dicha Corporación, *para la fecha de los hechos,* lo era el hijo de esta persona, quien responde al nombre de Carlos *Mattei Seijo.* Cabe preguntarse: *¿No sería ese "el Mattei" con quien hizo la transacción comercial por teléfono la principal testigo de cargo Graciela Arbucias?* En nuestro criterio, a nivel de instancia se procesó a la persona equivocada.

El proceder mayoritario realmente *no* constituye una intervención con la apreciación que de la prueba desfilada hiciera a nivel de instancia el juzgador de los hechos. *Llana y sencillamente nos enfrentamos a una situación de insuficiencia de prueba no sólo en cuanto a la existencia, o comisión, de conducta criminal castigable bajo nuestro ordenamiento jurídico, sino que en cuanto al supuesto responsable de la misma.*

Ante una situación como la descrita emerge, *como deber ineludible,* el decreto de absolución del apelante.

$$-\mathbf{O}-$$

Opinión concurrente emitida por la Juez Asociada Señora Naveira de Rodón, a la cual se unen el Juez Presidente Señor Andréu García y el Juez Asociado Señor Hernández Denton.

La sentencia dictada contra el acusado apelante Carlos Mattei Santiago debe ser revocada por cuanto la prueba desfilada es insuficiente para sostener la convicción. De no revocarse el fallo condenatorio, se estaría cometiendo una grave injusticia. Veamos.

Al apelante Mattei Santiago se le imputó la comisión del delito de apropiación ilegal agravada. Luego del juicio por tribunal de derecho, resultó convicto de haberse apropiado

de unos muebles de oficina,([1]) valorados en mil cuatrocientos veintinueve dólares con setenta centavos ($1,429.70), que la corporación Centro de Transmisiones Automáticas, Inc. (C.T.A.) le compró a Borinquen Radio Distributors, Inc. (Borinquen Radio). Se le sentenció a cumplir diez (10) años de prisión con los beneficios de sentencia suspendida.

Por versar este caso sobre un problema de suficiencia de la prueba, hemos leído y evaluado con detenimiento la Exposición Narrativa de la Prueba (E.N.P.), los autos originales y la prueba documental del caso. A continuación resumimos los hechos según éstos surgen de la prueba de cargo.

## I

### Los hechos

Borinquen Radio, una corporación dedicada a la venta de muebles de oficina, realizó una venta en virtud de una orden recibida por teléfono. Los muebles serían entregados en las oficinas de C.T.A. en Puerto Nuevo. La Sra. Graciela Arbucias, condueña del negocio Borinquen Radio, atendió personalmente las dos (2) llamadas telefónicas del comprador, quien, de acuerdo con el testimonio de la señora Arbucias, se identificó como el señor Mattei. Cabe señalar que la señora Arbucias no conocía al señor Mattei y nunca había hablado con él.

Con relación a la conversación que sostuvo con el señor Mattei, al ser contrainterrogada, la señora Arbucias "aceptó que diariamente recibía y atendía un número considerable de llamadas telefónicas. Le fue imposible recordar los nombres de las personas con las que habló por teléfono el

---

([1]) Los muebles de oficina vendidos al Centro de Transmisiones Automáticas, Inc. (C.T.A.) se describen como dos (2) escritorios ejecutivos, dos (2) credencias, dos (2) gaveteros, dos (2) sillas y dos (2) brazos de sillas.

21 de [julio] de 1986. Aceptó que ella preparó la factura de los muebles y que escribió 'Señor Mattei: dueño' ".(²)

Al día siguiente, 22 de julio de 1986, un empleado de Borinquen Radio se personó a las oficinas de C.T.A. en Puerto Nuevo para entregar la orden. Al llegar, los empleados de C.T.A. le comunicaron al Sr. José Arce, empleado de Borinquen Radio que estaba haciendo la entrega, que pasara esa tarde porque el pago no estaba listo. Ante estas circunstancias, éste optó por entregar la mercancía y luego regresar a cobrar, variando así lo acordado por teléfono. Cuando el empleado regresó, en C.T.A. le informaron que el señor Mattei estaba fuera de la isla. No pagaron los muebles.

Posteriormente, la señora Arbucias realizó varias gestiones de cobro. Éstas consistieron en llamar por teléfono dos (2) o tres (3) veces por semana y enviar a su empleado, el señor Arce, a C.T.A. a cobrar. Por último, ella acudió personalmente a C.T.A. Allí habló con la secretaria y con el jefe del taller. Al no poder cobrar su acreencia ni recuperar la mercancía por no encontrarse los muebles en las oficinas de C.T.A. en Puerto Nuevo, veintiocho (28) días después de haberse entregado la mercancía, el 19 de agosto la señora Arbucias optó por acudir al Cuartel General de la Policía a presentar una querella.

Así las cosas, el señor Arce se personó nuevamente a las

---

(²) De la prueba presentada por la defensa surge que el señor Concepción, Vice-Presidente de C.T.A., atestiguó que fue él quien hizo la orden referido por Casas Office Machines a Borinquen Radio. Se puede tomar conocimiento judicial de que en el mundo de los negocios, al pedir cotizaciones para la compra de mercancía, lo usual es llamar a distintas empresas. En el caso de autos, como Casas Office Machines no tenía la mercancía que C.T.A. buscaba, es plausible que lo refiriera a Borinquen Radio, como ocurre en el curso normal de los negocios. El hecho de que la señora Arbucias llamara a Casas Office Machines casi un mes después y allí le informaran que no conocían a Carlos Mattei no implica, necesariamente, que la persona que llamó por teléfono para solicitar la orden mintiera. Pudo haberse tratado de un referido casual de los múltiples que ocurren en el mundo de los negocios. Según atestiguó la señora Arbucias, la información ofrecida por la persona que hizo la orden no fue en el sentido de que C.T.A. era cliente reconocido de Casas Office Machines, sino que fue "referido" por esa empresa.

oficinas de C.T.A. en Puerto Nuevo y preguntó por la mercancía. El señor Arce expresó que

> ... un tal Frank Vega le dijo q[ue] él nunca había llevado mercancía allí y q[ue] nunca l[a] había visto allí. Q[ue] fue a la calle Guayama donde vio la mercancía y llamó a Arbucias[, ] quien la identificó.([3])

Entonces, la señora Arbucias acudió a la oficina de C.T.A. ubicada en la Calle Guayama de Hato Rey. Allí reconoció los muebles que había vendido. La señora Arbucias atestiguó que:

> Preguntó por el Sr. Mattei y le dijeron que estaba tomando café.
> Salió al patio y vio un señor que se identificó como Mattei. Expresó que reconoció la voz. Entonces ella le dijo que hacía un mes que lo andaba buscando. Mattei le indicó que él acababa de llegar.

El señor Mattei, con quien ella se entrevistó en la oficina de C.T.A. de la Calle Guayama, fue Carlos Mattei Santiago, el aquí apelante.([4]) Luego de conversar con el señor Mattei Santiago, ambos se dirigieron a la oficina donde estaban los muebles que ella había vendido. Éste le dijo que tenía que averiguar cómo habían llegado los muebles a esa oficina.

Más tarde, ese mismo día, la señora Arbucias acudió a querellarse al Centro de Investigaciones Criminales (C.I.C.). Allí la atendió el agente de la Policía Jorge L. Kuilan, de la División de Propiedad Hurtada del C.I.C. Éste declaró "que él ya conocía a Mattei por haber investigado

---

([3]) De la E.N.P. no surge la manera mediante la cual el señor Arce se enteró que los muebles en cuestión estaban en las oficinas de la Calle Guayama en vez de estar en Puerto Nuevo, lugar donde él los había entregado. Debido a que el señor Arce atestiguó que visitó las oficinas de C.T.A. en la Calle Guayama después de hablar con el señor Vega, se puede inferir que el señor Arce se enteró de la existencia de esta segunda oficina a través del propio señor Vega, el gerente de C.T.A.

([4]) De la prueba no controvertida por el Pueblo surge con meridiana claridad que el apelante Carlos Mattei Santiago se dedicaba a la producción de espectáculos especiales y era Presidente del Desfile Puertorriqueño de Nueva York.

unas cuantas querellas [en su contra]". No explicó qué clase de querellas había investigado, cuántas fueron ni el resultado de las mismas. El agente Kuilan fue a indagar lo sucedido a las oficinas de C.T.A. en Puerto Nuevo. Allí fue informado por el Sr. Frank Vega que "el señor Mattei, Presidente de la corporación, estaba fuera de Puerto Rico".

Conforme al testimonio de la señora Arbucias, ella y el agente Kuilan se reunieron con el señor Mattei Santiago. Éste encargó al señor Rafael Concepción, Vicepresidente de C.T.A., para que llegara a un acuerdo con la señora Arbucias. "Concepción les dijo que estaban 'apretados' económicamente y le pidió un término de noventa (90) días para pagar." Frente a la negativa de la vendedora, intercedió el agente Kuilan. Este logró un acuerdo entre la señora Arbucias y el señor Concepción para que la empresa pagara el 5 de septiembre o devolviera los muebles. El día convenido, cuando la señora Arbucias acudió a cobrar su acreencia, en lugar del cheque prometido se le entregó un sobre que contenía la petición de C.T.A. de 2 de septiembre de 1986 para acogerse al Capítulo 11 de la Ley de Quiebras. Cabe señalar que en la Petición de Quiebra C.T.A. había incluido, como uno de sus acreedores, a Borinquen Radio, especificando la deuda objeto de la supuesta apropiación.[5] No se aportó prueba para demostrar que la quiebra se presentó con el propósito de defraudar a Borinquen Radio, esto es, de no pagarle.[6] Milita contra esta inferencia el hecho de que la deuda era menos del uno por ciento (1%) del total de las deudas de C.T.A. ($1,429.70 de un total adeudado de $159,971.59).[7]

Confrontada con esta situación, la señora Arbucias se

---

[5] Véase *Exhibit* III (*exhibit* por estipulación de las partes).

[6] El récord no refleja lo que finalmente ocurrió con el caso en la Corte Federal de Quiebras.

[7] La mercancía fue recuperada por Borinquen Radio a raíz de un allanamiento en las oficinas de C.T.A. en Hato Rey, lo cual corrobora que los muebles estaban accesibles y no se intentó esconderlos.

comunicó con el agente Kuilan para informarle lo sucedido. Ambos acudieron a Fiscalía y el caso se sometió a un juez. Más tarde, el agente Kuilan acudió a C.T.A., donde se encontró con el licenciado Suárez. El agente le informó al abogado que existía una orden de arresto, con fianza montante a veinte mil dólares ($20,000), contra el señor Mattei Santiago. Ese mismo día, el apelante y su abogado fueron a Fiscalía para pagar la mercancía en cuestión, pero no se les aceptó la oferta de pago, ni mediante cheque de C.T.A. ni en efectivo.(8)

Finalmente, el agente Kuilan "[i]ndicó que se allanó a Centro de Transmisiones Automáticas de la calle Guayama y como resultado ocuparon los muebles que posteriormente fueron recuperados por Borinquen Radio Distributors".

Durante el juicio, luego de finalizada la prueba de cargo, la defensa solicitó la absolución perentoria del acusado en vista de que este caso se trataba de una deuda de naturaleza civil y no el delito de apropiación ilegal agravada, ya que la supuesta perjudicada había transferido legalmente la posesión de los muebles al entregarlos en un camión de su propia compañía. El tribunal de instancia denegó la solicitud. Entonces, la defensa presentó como testigos al Sr. Rafael Concepción, Vicepresidente de C.T.A., y al apelante Mattei Santiago.

Pasemos, pues, a discutir en conjunto los tres (3) señalamientos de error del apelante relacionados con la suficiencia de la prueba.(9)

---

(8) Sobre este particular, la señora Arbucias declaró " '[q]ue a quien se le ofreció el pago total fue al Fiscal Rodríguez Elías y a Kuilan. Que ella no le vendió al Centro de Transmisiones Automáticas y lo que se quería era que cayera bajo la Corte de Quiebras' ".

De la moción de reconsideración presentada en el foro de instancia el 20 de agosto de 1987 por el apelante, surge que durante "el juicio, la defensa quiso presentar documentos acreditativos de que Borinquen Radio compareció a la Corte de Quiebras, como parte interesada, pero dicha prueba no fue admitida".

(9) "SEGUNDO ERROR:

"El fallo del Honorable Tribunal de instancia es contrario a derecho y a la prueba desfilada.

## II

*La confiabilidad de la identificacion del acusado*

Reiteradamente hemos resuelto que la " 'identificación' del acusado es una de las etapas más esenciales o críticas en el procedimiento criminal ...". *Pueblo v. Rodríguez Maysonet*, 119 D.P.R. 302, 309 (1987). No puede haber una convicción válida sin prueba que relacione al acusado del delito, más allá de duda razonable, como el responsable del delito imputado. *Pueblo v. Gómez Incera*, 97 D.P.R. 249, 251 (1969); *Pagán Hernández v. Alcaide*, 102 D.P.R. 101, 112 (1974).

Con relación a la identificación de un acusado, debemos recordar las palabras de ese gran jurista Frankfurter: "What is the worth of identification testimony even when uncontradicted? The identification of strangers is proverbially untrustworthy. The hazards of such testimony are established by a formidable number of instances in the records of English and American trials." F. Frankfurter, *The Case of Sacco and Vanzetti*, 1927, pág. 30. Se ha reconocido que "[l]os mayores extravíos en la administración de la justicia lo ocasionan los errores en la identificación de los acusados". *Pueblo v. Gómez Incera*, supra, pág. 252.

Es imperativo, pues, que se identifique correctamente al autor del delito y se le pueda relacionar con los hechos que se le imputan.

La culpabilidad del acusado supone, no sólo prueba más allá de duda razonable sobre los elementos constitutivos del delito imputado (*corpus delicti*), sino también, por supuesto, que el acu-

---

"TERCER ERROR:

"Incidió la Sala de instancia al decretar [sic] culpable al apelante a base de una prueba insuficiente y que no estableció que existía intención criminal por parte del acusado-apelante de cometer el delito imputado.

"CUARTO ERROR:

"La prueba de cargo no rebatió la presunción de inocencia ni estableció la culpabilidad del apelante más allá de toda duda razonable."

sado es el responsable por la comisión del delito. Puede haber prueba más allá de duda razonable sobre que se cometió un asesinato u homicidio, *i.e.* —una persona fue decapitada—, o un robo, pero sin embargo, quedar duda razonable en torno a si el acusado fue autor o coautor del delito, lo que acarrea su absolución. De ahí la importancia de "identificar" al acusado. E.L. Chiesa, *Derecho procesal penal de Puerto Rico y Estados Unidos*, Colombia, Ed. Forum, 1991, Vol. I, Cap. 5, pág. 217.

La evidencia sobre la identidad de una persona fundada en la impresión personal de otra, aunque *bona fide*, es quizás, de todas las clases de evidencia, la que más sujeta está a producir un error. El tratadista LaFave, al analizar los elementos relacionados con la confiabilidad de la identificación de una persona, nos dice que con relación a eventos que en su origen no son importantes, pero que luego cobran un gran significado, el proceso perceptual selectivo puede producir graves fallas en la observación o captación que se hace del evento. Resulta también de gran importancia, al evaluar la confiabilidad de un testimonio sobre la identificación de un acusado, el tomar en consideración que las expectativas personales, las necesidades, los intereses y los prejuicios de un testigo pueden fácilmente distorsionar su percepción y memoria. Esto, unido al hecho de que la representación de un evento almacenado en la memoria está en constante cambio a medida que surge nueva información sobre el evento y que ésta difiere de la almacenada en la memoria, hace necesario que las circunstancias que rodean la identificación y tiendan a corroborarla cobren gran importancia. También resulta de gran relevancia el tener presente que los testigos, a medida que pasa el tiempo, tienden a cobrar mayor confianza en la correción de sus recuerdos; esto significa que la seguridad de un testigo en la exactitud de su recuerdo no necesariamente es reflejo de la veracidad de la misma. 1 *LaFave and Israel, Criminal Procedure* Sec. 7.1, págs. 548–553 (1984).

El profesor Chiesa hace el siguiente resumen de las causas de identificación errónea:

(i) percepción selectiva del evento, debido a limitaciones del cerebro humano

(ii) pobres condiciones de observación o percepción

(iii) tensión (*stress*) que produce el evento o crimen

(iv) *fallas de la memoria*

(v) *sugestividad*

(vi) *expectativas, necesidades y prejuicios personales*

(vii) dificultad en identificar personas de otra raza

(viii) *influencias extrínsecas o extrañas.* (Énfasis suplido y en el original.) Chiesa, *op. cit.*, pág. 218.

En *Pueblo v. Peterson Pietersz*, 107 D.P.R. 172, 186–187 (1978), establecimos como criterios a considerar para determinar la confiabilidad de la identificación de un acusado bajo la doctrina de la totalidad de las circunstancias los siguientes: (1) la oportunidad del testigo para observar (en este caso oír) la voz del autor del delito; (2) el grado de atención prestada (aquí sería a la conversación); (3) la exactitud de la descripción, o sea, de la voz o conversación; (4) el nivel de certeza demostrada al hacer la identificación (esto, claro está, implica el tomar en consideración las circunstancias que rodearon la misma), y (5) el tiempo transcurrido entre el haber escuchado la voz del acusado y su identificación.

En *Pueblo v. Rodríguez Maysonet*, supra, págs. 312–313, al aplicar la doctrina de la totalidad de las circunstancias, se aceptó la identificación del acusado mediante el reconocimiento de su voz. En dicho caso se trataba de los delitos de violación, sodomía, robo y restricción a la libertad agravados. Allí expresamos que, según el testimonio vertido por la perjudicada, "los hechos delictivos tuvieron una duración aproximada de cuarenta y cinco (45) minutos. *Durante ese período de tiempo, el apelante estuvo hablándole a la perjudicada. Su voz quedó grabada en la mente de ésta.* Treinta días más tarde, *sin intervención de clase alguna por parte de funcionarios del Estado [o de cualquier otra persona, de forma espontánea]*, la perjudicada reconoce esa voz *inmediatamente que la escucha* en su sitio de

trabajo. Observa, *durante cinco o seis minutos*, la persona de quien proviene la voz. *El físico de dicha persona corresponde al individuo que la violó y sodomizó"*. *Pueblo v. Rodríguez Maysonet*, supra, págs. 312–313.

El caso de autos es radicalmente distinto al de *Pueblo v. Rodríguez Maysonet*, supra. Procedemos ahora a analizar los hechos al amparo de los criterios establecidos en *Pueblo v. Peterson Pietersz*, supra, sobre la totalidad de las circunstancias con relación a la identificación.

(1) *La oportunidad de escuchar al acusado apelante.* La señora Arbucias declaró que la persona que la llamó para hacer la orden de los muebles fue Carlos Mattei Santiago. Sin embargo, a preguntas del propio Fiscal, admitió que antes del 21 de julio de 1986, cuando llamaron por teléfono para hacer la orden, ella no lo conocía. "Nunca antes había hablado con él y tampoco lo había visto." La única vez que supuestamente habló con él fue el día que se hizo la orden por teléfono. Debe destacarse el hecho de que la señora Arbucias también admitió que en la factura que ella preparó para la entrega de los muebles anotó "Cto. Transmisiones Automáticas" con la dirección de ésta, y como cliente "Sr. Matei [sic]", es decir, no hizo constar ambos apellidos.

Ella testificó que el 21 de julio de 1986 contestó dos (2) llamadas telefónicas de quien ella alega era el apelante. Ambas fueron conversaciones relativamente breves y de carácter puramente comercial. La primera fue para pedir unas cotizaciones de unos muebles de oficina. Ella le dio los precios. La segunda fue para preguntarle sobre si hacían ventas de cobro a la entrega (C.O.D.). Al ella contestar en la afirmativa, el interlocutor ordenó los muebles C.O.D.

(2) y (3) *Grado de atención prestada y la exactitud de la descripción.* No surge de la prueba que la persona que realizó las llamadas tuviese alguna característica distintiva en la voz o en su forma de hablar, como por ejemplo, un acento peculiar, tartamudeo o seseo al grado de hacer memorable su voz. La señora Arbucias no aseveró que se le

grabó la voz del apelante por tener éste un timbre de voz peculiar o por alguna otra circunstancia que llamara la atención que hubiese surgido de la conversación. Tampoco surge de la prueba que ella tuviera alguna habilidad poco usual para reconocer voces. A todo esto hay que añadir el hecho de que ésta admitió que fue una llamada comercial común y corriente, y que como vendedora ella diariamente recibía y atendía un número considerable de estas llamadas telefónicas. Le fue imposible recordar los nombres de las personas con las que habló el día en que se hizo la orden de los muebles.

(4) y (5) *Nivel de certeza demostrada al hacer la identificación y tiempo transcurrido.* La testigo principal de El Pueblo, la señora Arbucias, identificó al apelante señor Mattei Santiago, por su voz, *luego de que se le indicara que "Mattei", se encontraba tomando café.* "Salió al patio y vio a un señor que se identificó como Mattei." Es entonces que alegó reconocer la voz. *Debemos tener presente que ella nunca lo había visto y que sólo había oído la voz que identificó como la de él, en dos (2) breves ocasiones, en conversaciones comerciales comunes y corrientes hacía ya más de un mes.*

*Cabe señalar, además, que el Ministerio Público no adujo prueba de que el señor Mattei Santiago tuviera una relación directa con C.T.A. Es más, de la prueba documental surge que éste nunca ha sido parte de la empresa ni mucho menos accionista de la misma. Es importante aclarar que el apelante Mattei Santiago sí es el padre de Carlos Mattei Seijo, que era, para la fecha en que ocurrieron los hechos, Presidente de C.T.A. El señor Mattei Seijo fue uno de los incorporadores de C.T.A., era uno de sus tres (3) directores y el accionista principal de la empresa con un 40% de las acciones a su nombre.*[10]

Al evaluar la evidencia presentada sobre la identifica-

---

[10] *Exhibits* II y III admitidos por estipulación entre las partes.

ción del apelante Mattei Santiago, también hay que tomar en cuenta que la señora Arbucias era consciente al momento de efectuar la transacción comercial con C.T.A. que un tal "Sr. Matei (sic) (Dueño)" se desempeñaba allí. Así lo hizo constar en la factura admitida en evidencia. La identificación que hizo ella el día que fue a las oficinas de C.T.A. en la calle Guayama no fue otra cosa que relacionar erróneamente el apellido de un cliente que le debía un dinero, y a quien no había podido localizar, con otra persona que le habían informado se encontraba tomando café y que se identificó como Mattei. Esta persona tenía el mismo nombre y primer apellido que su cliente ya que estaban emparentados: era su padre.[11]

Un análisis integral de la totalidad de las circunstancias en el caso de autos, según ésta surge de la prueba de cargo, nos lleva a concluir que el Ministerio Público no aportó prueba suficiente para avalar la conclusión de que la señora Arbucias reconoció, espontáneamente, la voz del apelante e hizo una identificación confiable.[12] No cabe la menor duda de que los hechos en este caso son muy distintos a los que apoyaron la confiabilidad de la identificación por la voz en el caso *Pueblo v. Rodríguez Maysonet*, supra.

---

[11] Cabe señalar que para evitar el equívoco de confundir a dos (2) personas diferentes que tienen el mismo apellido, los puertorriqueños utilizamos ambos apellidos, esto es, el paterno y el materno. Tanto el apelante como su hijo se llaman Carlos Mattei. La única diferencia en el nombre resulta ser el apellido materno.

[12] Tratándose de un problema de suficiencia de la prueba, no de apreciación o credibilidad, no aplica la norma de que en ausencia de error manifiesto, prejuicio, parcialidad o pasión no existe fundamento en derecho para intervenir con la determinación de hecho del foro de instancia. *Pueblo v. De Jesús Rivera*, 113 D.P.R. 817, 826 (1983); *Pueblo v. Cabán Torres*, 117 D.P.R. 645 (1986); *Pueblo v. Miranda Ortiz*, 117 D.P.R. 188 (1986).

— o —

Opinión disidente del Juez Asociado Señor Fuster Berlin-
geri, a la cual se unen los Jueces Asociados Señores Ne-
grón García y Alonso Alonso.

Tenemos ante nuestra consideración una situación no
resuelta antes por este Tribunal. Debemos decidir si los
hechos particulares del caso constituyen el delito de apro-
piación ilegal agravada, según dictaminó el tribunal de
instancia, o si en cambio, como alega el apelante, sólo se
trata de una deuda de naturaleza civil cuyo incumpli-
miento no es un acto criminal punible.(¹)

I

El apelante, juzgado por tribunal de derecho, fue decla-
rado culpable del delito de apropiación ilegal agravada el 9
de marzo de 1987 y se le impuso una sentencia de diez (10)
años de presidio el 26 de febrero de 1988, sentencia que fue
suspendida al concedérsele los beneficios del régimen de
libertad a prueba.

Según la evidencia de cargo, *que fue aceptada como
cierta por el tribunal de instancia, sin duda alguna,*(²) el 21
de julio de 1986 el apelante Carlos Mattei Santiago llamó
por teléfono a la Borinquen Radio Distributors —empresa

---

(¹) Además de la cuestión medular que plantea el apelante sobre la *suficiencia*
de la prueba para establecer el delito imputado, también se impugna un aspecto de
la *apreciación* de la misma. El apelante alega en esencia que no fue él quien hizo
negocios con el perjudicado y que debió haber sido su hijo, quien también se llama
Carlos Mattei y es Presidente de la compañía que obtuvo los muebles en cuestión.

En la opinión concentramos nuestra atención en lo relativo a la suficiencia de la
prueba no sólo porque es el asunto principal, sino además porque el apelante no ha
demostrado que hayan razones serias y fundadas para cuestionar el juicio del juzga-
dor de los hechos. *Pueblo v. Carrasquillo Carrasquillo*, 102 D.P.R. 545 (1974). Según
se desprende de la exposición narrativa de la prueba, la alegación del apelante en
cuestión fue claramente controvertida por la prueba de cargo y al tribunal de instan-
cia evidentemente no le mereció credibilidad la prueba de la defensa.

(²) En las Minutas de 9 de marzo de 1987, el juez de instancia que vio la prueba
hace constar que "el Tribunal declara al acusado culpable ... *ya que no tiene duda*".
(Énfasis suplido.)

dedicada a la venta y distribución de muebles de oficina— se identificó por su nombre e indagó sobre los precios y la entrega de determinada mercancía. Luego de dos (2) conversaciones del apelante con la dueña de la empresa, aquél ordenó unos muebles de oficina que le interesaban, indicándole a la dueña de la empresa que había sido referido a ellos por Casas Office Machines y solicitando que le enviaran los muebles al local de su compañía sita en Puerto Nuevo. El apelante se comprometió a pagar el costo de los muebles ($1,429.70) al momento mismo en que se le entregara la mercancía.

Temprano en la mañana del día siguiente, los muebles fueron llevados por un empleado de Borinquen Radio Distributors al lugar indicado por el apelante. El empleado no pudo obtener el pago de los muebles al momento de la entrega, según se había acordado, porque dos (2) personas vinculadas a la compañía donde se entregaron los muebles, y que recibieron los mismos a nombre del apelante, le indicaron a dicho empleado que el pago no estaba listo y le sugirieron que regresara en la tarde de ese día para obtenerlo. El empleado de la empresa vendedora volvió esa tarde, pero tampoco logró el pago, explicándosele esta vez que el apelante estaba fuera de Puerto Rico.

Posteriormente, en varias ocasiones, tanto el empleado como la dueña de la empresa vendedora gestionaron el pago de la mercancía sin éxito. Siempre se les indicaba que el apelante estaba de viaje o que los oficiales de la compañía no estaban presentes. La empresa entonces trató de obtener la devolución de los muebles, enviando a recogerlos al empleado que los entregó, pero ello tampoco fue posible porque los muebles ya no estaban en el local donde habían sido entregados. En vista de ello, la dueña de la empresa acudió a Casas Office Machines para indagar sobre el apelante que éstos le habían referido y, allí, se enteró de que ellos no lo conocían. Así las cosas, el 19 de agosto de 1986 la dueña de la empresa vendedora presentó la querella correspondiente contra el apelante en el Cuartel General de la Policía.

Más tarde, los muebles fueron encontrados en otro local de la compañía que los había adquirido, y la dueña de la empresa vendedora se presentó a este otro local para verificar si en efecto los muebles eran los suyos. Allí preguntó por el apelante y, al encontrarlo, le planteó la situación. El apelante alegó desconocer de qué ella le estaba hablando y le dijo que tenía que averiguar cómo habían llegado los muebles hasta allí. La dueña decidió entonces acudir ante el agente de la Policía a cargo de la investigación del caso para informarle lo acontecido. El agente, adscrito a la División de Propiedad Hurtada del Centro de Investigaciones Criminales, le indicó a la dueña que él ya conocía al apelante, porque había investigado unas cuantas querellas contra él, y sugirió que fueran a verlo juntos. Se trasladaron al local de la compañía donde ahora estaban los muebles y, allí, se reunieron con el apelante. Éste, que antes había alegado desconocer el asunto de los muebles, admitió que la propiedad en cuestión era de la dueña de la empresa vendedora, pero les pidió que le dieran una oportunidad para pagar porque en ese momento no podía hacerlo. El apelante entonces encargó al Vicepresidente de la compañía a discutir la cuestión del pago con ellos, y el agente de la Policía intercedió para que llegasen a un acuerdo. La dueña de la empresa vendedora no estuvo conforme inicialmente pero luego accedió a esperar hasta el 5 de septiembre de 1986 para el pago de lo adeudado o, en su defecto, para la devolución de los muebles.

El 5 de septiembre la dueña de la empresa vendedora fue a cobrar el pago según acordado, pero en vez del dinero prometido sólo recibió una copia de un documento expositivo de que la compañía que tenía los muebles se había acogido a la Ley de Quiebras federal tres (3) días antes. La dueña y el agente de la Policía le informaron entonces lo sucedido al Fiscal a cargo del caso, quien procedió a someter el mismo.

Más tarde, luego que el agente de la Policía a cargo del

caso diligenciara una orden de arresto contra el apelante, éste y su abogado fueron a Fiscalía y ofrecieron pagar la mercancía en efectivo, pero no se les aceptó el dinero.

## II

Plantea el apelante que no hay aquí hechos constitutivos del delito de apropiación ilegal. Alega específicamente que no existe el elemento de apoderación o sustracción ilegal ni la intención criminal, que es condición del delito imputado. Según el apelante, el caso sólo trata de una transacción comercial legítima entre dos (2) corporaciones mediante la cual, por "estrecheces económicas", no fue posible cumplir con lo adeudado, y lo que procede —si algo— es una acción civil por incumplimiento de contrato.

En nuestra jurisprudencia, sobre el delito de apropiación ilegal, hemos señalado reiteradamente que bajo dicho delito se intenta penalizar toda una diversa gama de conductas criminales que antes se tipificaban separadamente. El texto vigente de este delito consolida varios delitos del anterior Código Penal, tales como el hurto, el abuso de confianza, la falsa representación, la estafa y otros. *Pueblo v. Padró Ríos*, 105 D.P.R. 713 (1977); *Pueblo v. Uriel Álvarez*, 112 D.P.R. 312 (1982); *Pueblo v. Miranda Ortiz*, 117 D.P.R. 188 (1986). La agrupación de todos esos delitos en uno solo se hizo para evitar las dificultades procesales que surgían con frecuencia debido a la confusión engendrada por la diversificación de elementos en tales delitos. Se quiso superar el enredo conceptual que se había creado al dividir arbitrariamente un hecho punible esencial en varios delitos estatutarios. *Pueblo v. Rodríguez Vallejo*, 100 D.P.R. 426 (1972).

El hecho punible esencial, denominador común de toda la gama de conductas criminales comprendidas en este delito, es el apoderarse ilícitamente, pero sin violencia o intimidación, de bienes muebles pertenecientes a otra persona. Los elementos definitorios del delito son, en pri-

mer lugar, la *apropiación*, que quiere decir que el imputado de algún modo ha hecho propia una cosa ajena. Debe haber una transferencia de una propiedad mueble de las manos de su legítimo dueño a las del que propiamente no tiene derecho a ella. En segundo lugar, la *desposesión, despojo* o *sustracción* de la propiedad mueble, esto es, la transferencia debe hacerse de algún modo *ilegal* sin llegar a la violencia o intimidación. Puede ser furtivamente o por fraude, simulación, ardid o treta, o sea mediante cualquier forma de engaño o desconocimiento del dueño. Lo medular es que de algún modo que no sea violencia o intimidación se conculque o vulnere la voluntad del dueño; es decir, que de alguna manera deliberada se rebase su consentimiento. Si se dan estas dos (2) circunstancias esenciales, se incurre en conducta criminal.

Aplicando estas normas a los hechos en cuestión, no cabe duda de que se cometió el delito. La transferencia de la propiedad mueble ocurrió innegablemente. El apelante logró hacer suya la mercancía que le pertenecía a la empresa vendedora. Esa transferencia se hizo ilícita y deliberadamente; más allá del consentimiento del dueño de la propiedad. No tratamos aquí con una situación ordinaria donde una persona vende unos muebles pero luego, fortuitamente, no logra que el comprador se los pague. Como cuestión de derecho, hubo prueba suficiente —que el juzgador de los hechos creyó— para establecer que la transferencia se hizo mediante treta o engaño. La dueña de la propiedad sufrió lo que puede considerarse como una cadena de maquinaciones por parte del apelante. Primero se le dieron referencias falsas. Seguidamente, se le dijo que los muebles se pagarían al entregarse. Después se le dijo que el pago no estaba listo. Luego se le dijo que los que podían autorizar el pago estaban ausentes. Entonces, se le escondieron los muebles. Posteriormente se le pidió que diera otra oportunidad para pagarlos, aunque se preveía una quiebra. De los hechos y de las maquinaciones aludi-

das surge la treta o el engaño y la intención ilegal requerida para concluir que se cometió el delito en cuestión. *Pueblo v. Padró Ríos*, supra. Así lo entendió el juez que aquilató la prueba, cuya apreciación merece gran respeto y deferencia —*Pueblo v. Rosario Cintrón*, 102 D.P.R. 82 (1974); *Pueblo v. Nevarez Virella*, 101 D.P.R. 11 (1973); *Pueblo v. Rodríguez Hernández*, 91 D.P.R. 183 (1964)— por ser quien está en mejor posición para valorar la misma. *Pueblo v. Pagán Díaz*, 111 D.P.R. 608 (1981); *Pueblo v. Cruz Granados*, 116 D.P.R. 3 (1984). Al no demostrar el apelante que el juez de instancia incurrió en error manifiesto o que actuó con prejuicio o parcialidad, nos obliga su apreciación de la prueba. *Pueblo v. Sanabria Pérez*, 113 D.P.R. 694 (1983); *Pueblo v. Lebrón González*, 113 D.P.R. 81 (1982); *Pueblo v. Burgos Hernández*, 113 D.P.R. 834 (1983); *Pueblo v. Rivero, Lugo y Almodóvar*, 121 D.P.R. 454 (1988).

Es menester reiterar que no hay nada en los autos de este caso que permita impugnar el juicio del juzgador de los hechos. Ciertamente no existen las razones serias y fundadas —*Pueblo v. Carrasquillo Carrasquillo*, 102 D.P.R. 545 (1974)— que deben estar presentes para abandonar nuestra firmemente arraigada y habitual postura de otorgarle gran respeto y deferencia a la apreciación del juez que aquilató la prueba. Según señalamos al principio de esta opinión (en la primera nota al calce) el apelante, luego de fundar su defensa principalmente en la cuestión de derecho que hemos discutido antes, alega *accesoriamente* que el que hizo negocios con el perjudicado no fue él y que debió haber sido su hijo, quien también se llama Carlos Mattei y es, según determinados documentos, Presidente de la compañía que obtuvo los muebles en cuestión. *Pero esta alegación no le mereció crédito al juzgador de los hechos*, quien recibió y sopesó toda la prueba de modo directo e integral, evaluación que no está a nuestro alcance.

Según la prueba que el juzgador de los hechos estimó veraz, el nombre que se le dio a la perjudicada cuando se

ordenaron los muebles fue el del apelante, no el de su hijo. Cuando los muebles se entregaron, fueron recibidos a nombre del apelante, no de su hijo. Cuando no se hizo el pago debido de los muebles, la excusa que se dio fue que el apelante —no su hijo— estaba ausente de Puerto Rico. Luego la perjudicada identificó al apelante —no a su hijo— por su voz a base de dos (2) llamadas telefónicas que habían sostenido. Más importante aún, fue el apelante —y no su hijo— la persona que estuvo a cargo de los asuntos de la compañía las dos veces que la perjudicada visitó el local de esa compañía para tratar de cobrar los muebles u obtener su devolución. Además, fue el apelante —y no su hijo— quien fue identificado por el agente de la División de Propiedad Hurtada del Centro de Investigaciones Criminales de la Policía a cargo del caso como la persona a quien él había investigado en otras querellas. También fue el apelante —no su hijo— quien admitió, tanto a la perjudicada como al agente policiaco, que los muebles en cuestión se le debían a la perjudicada, prometiendo que se pagarían si se le daba otra oportunidad para ello. Finalmente, fue el apelante —no su hijo— quien le encargó al Vicepresidente de la compañía discutir la cuestión del pago con la perjudicada. Todo esto ocurrió *antes* de que se expidiera la orden de arresto contra el apelante, quien entonces trató de resolver el asunto ofreciendo pagar en efectivo el precio de los muebles en cuestión. Vista cumulativamente toda esta prueba, que fue creída por el juez que juzgó los hechos, es más que suficiente para sostener la determinación judicial de instancia de que fue el apelante y no su hijo quien cometió el delito. *De hecho, el hijo no estuvo involucrado de modo alguno en ninguno de los varios eventos de este caso en torno a los cuales se presentó prueba.* Por ello es sorprendente e inconcebible que, como en efecto hace la mayoría de este Tribunal, se pretenda cuestionar la apreciación del juzgador sin fundamento que constituya error manifiesto, prejuicio o parcialidad, que son las únicas causas que en derecho permitirían tal impugnación. El juzga-

dor determinó que no tenía duda sobre quién fue el autor de los hechos delictivos. Vista la prueba cumulativa que tuvo ante sí, que en derecho es claramente suficiente y constitutiva del delito imputado, no tenemos otra alternativa que confirmar la sentencia del tribunal de instancia, independientemente de las opiniones que algunos de los Jueces de mayoría puedan tener en cuanto a que esta parte del derecho penal no se debe aplicar a "negocios" entre comerciantes.

Por los fundamentos expuestos, disentimos de la opinión mayoritaria. Hubiéramos confirmado la sentencia del Tribunal de instancia.